[Civ. No. 41816. Second Dist., Div. One. Dec. 13, 1973.]

JOHN M. ALEX, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

## COUNSEL

Mohi, Morales, Dumas & Glasman and Frank C. Morales for Plaintiff and Appellant.

John D. Maharg and John H. Larson, County Counsel, Edward H. Gaylord, Joe Ben Hudgens and Edward G. Pozorski, Deputy County Counsel, for Defendants and Respondents.

## OPINION

**HANSON, J.—**

### BACKGROUND

The petitioner-appellant John M. Alex is a judge of the Municipal Court for the Citrus Judicial District of Los Angeles County. His salary is paid by respondent County of Los Angeles. On or about March 20, 1970, appellant declared his intention and filed his candidacy for the office of United States Congressman, 24th Congressional District of California.

The judge was required by the County of Los Angeles, pursuant to article VI, section 17 of the California Constitution, to take a leave of absence without pay at the time of his declaration of candidacy. The judge requested permission from the Judicial Council to sit pro tempore during his period of candidacy. The request was denied. He (the judge) was not elected to Congress and returned to his judicial duties on June 3, 1970. He thereafter demanded from the County of Los Angeles back payment of his salary for the period March 20, 1970, to June 3, 1970. This demand was refused.

### PLEADINGS

Petitioner-appellant John M. Alex (hereinafter Judge Alex) filed a complaint on December 1, 1971, for declaratory relief and a petition for writ of mandate in the Superior Court of Los Angeles County alleging facts as hereinbefore described and seeking back payment of salary in the

total sum of $6,012.38 for the period March 20, 1970, to June 3, 1970, in which he took a leave of absence for the purpose of running for Congress. The named defendants were the County of Los Angeles and its board of supervisors.

The defendants (respondents herein) demurred on the ground that plaintiff did not state facts sufficient to constitute a cause of action for declaratory relief or writ of mandate.

On April 28, 1972, the superior court sustained the demurrer to the complaint without leave to amend and denied the motion for peremptory writ of mandate.

Plaintiff appeals.

## CONTENTIONS

Plaintiff-appellant contends that article VI, section 17 of the California Constitution (1) is discriminatory and a denial of the "equal protection" clause of the Fourteenth Amendment of the federal Constitution; (2) is unconstitutionally vague, uncertain and overly broad; and (3) is an unconstitutional attempt by the State of California to prescribe additional or different eligibility requirements to the constitutional office of United States Congressman.

This is a case of first impression.

## THE PROVISION AT ISSUE

Article VI, section 17[1] of the Constitution of the State of California

[1]History of section 17:

In 1963 the Judicial Council recommended that the general revision of the California Constitution's judicial article (art. VI) be undertaken only after full scale study and detailed consultation with interested groups. The 1963 Legislature created a Constitutional Revision Commission, responsible to its joint committee on legislative organization, and charged the commission with the responsibility for recommending desirable constitutional changes to the 1965 Legislature. The commission created a subcommittee on article VI, as one of the articles intended for consideration of revision.

The present section 17, as set forth in the body of this opinion, is the result of a full scale study and detailed consultation with groups most intimately involved. It combines former sections 18 and 15 of article VI, as modified.

The former section 18 provided: "The justices of the Supreme Court, and of the district courts of appeal and the judges of the superior courts and the municipal courts shall be ineligible to any other office or public employment than a judicial office or employment during the term for which they shall have been elected or appointed, and no justice or judge of a court of record shall practice law in or out of court during his continuance in office; provided, however, that a judge of the superior court or of a municipal court shall be eligible to election or appointment to a public

(hereinafter section 17), added as an amendment by the electors of the State of California at the general election on November 8, 1966, provides *in toto* as follows:

"A judge of a court of record may not practice law and during the term for which he was selected is ineligible for public employment or public office other than judicial employment or judicial office. A judge of the superior or municipal court may, however, become eligible for election to other public office by taking a leave of absence without pay prior to filing

office during the time for which he may be elected, and the acceptance of any other office shall be deemed to be a resignation from the office held by said judge."

The former section 15 provided: "No judicial officer shall receive to his own use any fees or perquisites of office."

(The last sentence in the present § 17, not at issue in the instant case, being separable, will not be discussed.)

The pamphlet supplied the voters prior to the general election of November 8, 1966, preceded the full text with a summary. The summary capsuled the changes in respect to section 17, as follows: "A superior or municipal court judge would be required to take a leave of absence without pay when seeking other public office."

The argument in favor of the proposition for the constitutional amendment preceding the full text, which included section 17, in part, was as follows:

"Argument in Favor of Proposition No. 1-a

"One of our most crucial needs in these times is effective government—based on a modern Constitution.

"Yet, concerning the California Constitution, former State Supreme Court Justice Phil S. Gibson has stated:

" '(Our Constitution is) . . . cumbersome, unelastic, and outmoded. . . . It is not only much too long, but it is almost everything a Constitution ought not to be.'

"California's Constitution is hardly modern. It is the third longest Constitution in the world and has been amended over 300 times since 1879. In short, it is a mess.

"In 1962, by more than a 2 to 1 vote, the people mandated modernization of their Constitution. As a result, a blue-ribbon Constitutional Revision Commission of 69 leading Californians was appointed to recommend a revised Constitution. These prominent citizens from all walks of life worked without pay for three years and spent thousands of hours at their task.

"The result is Proposition 1-a. It is the first phase of the Commission's work. It covers approximately one-third of the existing Constitution, and reduces that one-third from 22,000 to 6,000 words.

"The reforms in Proposition 1-a have been labeled by party leaders and non-partisan groups alike as essential to the effective operation of government.

"Proposition 1-a puts the Constitution into modern, concise and easily understandable language.

" . . . . . . . . . . . . . . . .

"State government today faces new challenges and new responsibilities not dreamed of in 1879. This new Constitution helps to meet those challenges by making government itself more flexible and able to do the job which our citizens have a right to expect.

"If states are to survive and prosper in our system, they need the tools of effective government—Proposition 1-a is a giant step toward that. California can lead the way. Vote YES on 1-a."

There were no arguments printed against the proposed changes pertaining to the judicial department of government.

a declaration of candidacy. Acceptance of the public office is a resignation from the office of judge.

"A judicial officer may not receive fines or fees for his own use."

## DISCUSSION

### DOES SECTION 17 VIOLATE THE "EQUAL PROTECTION" CLAUSE?

■ The Fourteenth Amendment to the federal Constitution provides, in part, as follows: ". . . No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

By judicial analysis, on both the federal and state levels, of a myriad of cases raising the "equal protection" clause, the following broad principles of its application have evolved.

Legislation must be "general" in its terms and application; "special" legislation is prohibited.

■ Although not easy to define, a law is said to be "general" when it relates to and operates uniformly upon the whole of a validly selected single class of persons similarly circumstanced. A validly selected class is one in which there is a reasonable classification of persons for legitimate legislative purposes founded on a reasonable and rational basis as to matters which possess some natural or intrinsic or constitutional distinction as to justify and require special treatment.

■ A law may be said to be "special" if it confers particular privileges or imposes peculiar disabilities or burdensome conditions, in the exercise of a common right, on a class of persons arbitrarily selected from the general body of those who stand in precisely the same relation to the subject of the law. (*Serve Yourself Gas etc. Assn.* v. *Brock,* 39 Cal.2d 813 [249 P.2d 545]; 11 Cal.Jur.2d, Constitutional Law, §§ 258-264; 3 Witkin, Summary of Cal. Law (7th ed. 1960) Constitutional Law, §§ 125, 129, 130; 16A C.J.S., Constitutional Law, § 505.)

Case law has developed a two-level standard in evaluating legislative classifications under the "equal protection" clause. The traditional test is that there is a presumption of constitutionality which will not be overthrown by the courts unless it is palpably arbitrary and beyond rational and reasonable doubt erroneous and no set of facts reasonably can be conceived that would sustain it. This traditional test is usually applied to "economic" regulations.

The other, and stricter, standard is employed in cases involving "suspect classifications" or "fundamental interests." Here the courts take a close

look at the classification and require not only a *compelling* state interest which justifies the law, but also that the distinctions drawn by the law are *necessary* to further its purpose. (*In re Antazo,* 3 Cal.3d 100 [89 Cal.Rptr. 255, 473 P.2d 999]; *California State Employees' Assn.* v. *Flournoy,* 32 Cal.App.3d 219 [108 Cal.Rptr. 251].)

■ It would be academic to analyze whether section 17 falls in the category of "economic" or "fundamental interest," or hybrid, and which standard would apply. We hold that, applying the stricter standard, section 17 is "general" in character, that the class was validly selected, operates uniformly and does not violate the "equal protection" clause.

The inherent nature of the judicial function demands it be divorced from the political arena to avoid exposure to possible conflicts of interest and political influence. The provision in its wisdom seeks to eliminate the risk of judges' decisions being subconsciously and improperly influenced by considerations of the effect of a popular or unpopular ruling on his candidacy for public office, being aware that his decisions may be reported by the news media or used by his political adversary.

In addition, the courts are inextricably married to the clock and calendar. Like a train, the court must start and run on schedule to accommodate the public and attorneys using the courts to dispose of their legal matters. It is common knowledge that a hard fought political campaign makes demands on the candidate which cut deeply into the working day. The taxpayers, who pay the bills, demand an impartial judiciary who perform a full day's work; fellow judges, inundated with litigation which must be disposed of, have a right to expect every colleague to perform his fair share of the heavy caseload; and the attorneys and litigants have a right to expect their matters will be handled expeditiously and fairly, free of outside interference or influence engendered by the political pursuits of judges.

Thus the compelling, legitimate state purpose and policy underlying the provision and the necessary distinctions drawn because of the natural, intrinsic and constitutional requirements of the judge's office are (1) to save the judges from the "entanglements, at times the partisan suspicions" which may result when a judge engages in the extrajudicial activity of campaigning for public office; and (2) "to conserve the time of the judges for the performance of their work" so as not to "embarrass, if not in fact impede, the orderly and proper discharge of their judicial functions." (See *Abbott* v. *McNutt,* 218 Cal. 225 [22 P.2d 510, 89 A.L.R. 1109].)

The requirements of section 17 are not empty. They are essential to maintain in the trial court an atmosphere in which justice can be done.[2]

The recent case of *United States Civil Service Commission* v. *National Association of Letter Carriers, AFL-CIO,* 413 U.S. 548 [37 L.Ed.2d 796, 93 S.Ct. 2880] (hereinafter *CSC* v. *Letter Carriers*) decided in June 1973, involved a direct appeal to the United States Supreme Court from a three-judge federal district court judgment in a class action by some

[2]California has long been a leader in keeping politics out of the courtroom. The "Canons of Judicial Ethics" adopted by the Conference of California Judges in 1949 provide in part:

"The Conference of California Judges, mindful that the character and conduct of a judge should never be objects of indifference, and that declared ethical standards become habits of life, deems it desirable to set forth its views respecting those principles which should govern the personal practice of members of the judiciary in the administration of their offices. The Conference accordingly adopts the following Canons, as a proper guide and reminder for justices and judges of courts of record in California, and as indicating what the people have a right to expect from them.

" . . . . . . . . . . . . ., .

"24—Partisan Politics

"While entitled to entertain his personal views of political questions, and while not required to surrender his rights or opinions as a citizen, *it is inevitable that suspicion of being warped by his political bias will attach to a judge who becomes the active promoter of the interests of one political party or candidate against another.* [Italics added.] He should avoid making partisan political speeches, making or soliciting payment of assessments or contributions to party funds, the public endorsement of candidates for political office, or participation in party conventions.

"A judge should neither accept nor retain a place on any party committee nor act as party leader, nor engage generally in partisan activities.

"Nothing in this canon shall be deemed to prevent any judge from attending and speaking (a) on the subject of his own candidacy at any political gathering held within a reasonable time prior to an election at which he is a candidate for election or re-election (b) on any other nonpartisan subject."

The canons were originally adopted on August 30, 1949 (see 24 State Bar J. 298 (1949)) and have been amended in several instances. They are published in Appendix to California Rules of Court to make them readily available to all members of the judiciary. Section 17 raises this concept in California from a "canon," sans teeth, to a constitutional mandate, avec bite.

The trend is now nationwide. The American Bar Association has recently adopted "Canons of Judicial Ethics" which provide that a judge should resign his office when he becomes a candidate either in a party primary or in a general election for any nonjudicial office. Canon 7 provides in part: "A Judge Should Not Engage in Political Activity Except to the Extent Necessary to Obtain or Retain Judicial Office Through an Elective Process.

"A judge or candidate for elective judicial office should not solicit funds for, or pay an assessment or make a contribution to, a political organization or candidate except as authorized below; he should not act as a leader or· hold any office in a political organization; he should not make speeches for a political organization or candidate or publicly endorse any candidate for non-judicial public office; and he should not engage in any other political activities except on behalf of measures to improve the administration of justice.

" . . . . . . . . . . .

"A. A judge should resign his office when he becomes a candidate either in a party primary or in a general election for any non-judicial office. . . ."

individual federal employees, an employees' union, and certain local Democratic and Republican political committees challenging as unconstitutional on its face the prohibition in section 9(a) of the Hatch Act, now title 5 United States Code, section 7324(a)(2), against federal employees' taking "an active part in political management or in political campaigns." The three-judge district court recognized "well-established governmental interest in restricting political activities by federal employees," but held that the statutory definition of "political activity" was both vague and overbroad and therefore unconstitutional.

The United States Supreme Court reversed the ruling of the three-judge panel and held the Hatch Act constitutional. The Supreme Court noted 413 U.S. at page 553 [37 L.Ed.2d at page 802] that the three-judge court: ". . . recognized the 'well-established governmental interest in restricting political activities by federal employees which [had been] arrested long before enactment of the Hatch Act,' 346 F.Supp. at 579, as well as the fact that the 'appropriateness of this governmental objective was recognized by the Supreme Court of the United States when it endorsed the objective of the Hatch Act. *United Public Workers* v. *Mitchell,* 330 U.S. 75 [91 L.Ed. 754, 67 S.Ct. 556] . . . (1947). . . .' "

The Supreme Court said 413 U.S. at page 556 [37 L.Ed.2d at page 804]: "We unhesitatingly reaffirm the Mitchell holding that Congress had, and has, the power to prevent Mr. Poole and others like him from holding a party office, working at the polls and acting as party paymaster for other party workers. An Act of Congress going no farther would in our view unquestionably be valid. So would it be if, in plain and understandable language, the statute forbade activities such as organizing a political party or club; actively participating in fund-raising activities for a partisan candidate or political party; *becoming a partisan candidate for, or campaigning for, an elective public office;* actively managing the campaign of a partisan candidate for public office; initiating or circulating a partisan nominating petition or soliciting votes for a partisan candidate for public office; or serving as a delegate, alternate or proxy to a political party convention. *Our judgment is that neither the First Amendment nor any other provision of the Constitution invalidates a law barring this kind of partisan political conduct by federal employees.*" (Italics added.)

After tracing the history of the Hatch Act, the court stated 413 U.S. at pages 563-565 [37 L.Ed.2d at pages 808, 809]: "This account of the efforts by the Federal Government to limit partisan political activities by those covered by the Hatch Act should not obscure the equally relevant fact that all 50 States have restricted the political activities of their own employees.

"Until now, the judgment of Congress, the Executive and the country appears to have been that partisan political activities by federal employees must be limited if the Government is to operate effectively and fairly, elections are to play their proper part in representative government and employees themselves are to be sufficiently free from improper influences. E.g., 84 Cong.Rec. 9598, 9603; 86 Cong.Rec. 2360, 2621, 2864, 9376. The restrictions so far imposed on federal employees are not aimed at particular parties, groups or points of view, but apply equally to all partisan activities of the type described. They discriminate against no racial, ethnic or religious minorities. Nor do they seek to control political opinions or beliefs, or to interefere with or influence anyone's vote at the polls.

" . . . . . . . . . . . . . .

". . . A major thesis of the Hatch Act is that to serve this great end of Government—the impartial execution of the laws—it is essential that federal employees not, for example, take formal positions in political parties, not undertake to play substantial roles in partisan political campaigns and *not run for office on partisan political tickets.* [Italics added.] Forbidding activities like these will reduce the hazards to fair and effective government. See 84 Cong.Rec. 9598; 86 Cong.Rec. 2433-2434, 2864; Hearings on S 3374 and S 3417 Before the Committee on Post Office and Civil Service, 92d Cong., 2d Sess., 171.

"There is another consideration in this judgment: it is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it if confidence in the system of representative Government is not to be eroded to a disastrous extent."

*A fortiori,* if political restraints placed by the Hatch Act on a letter carrier in the executive branch of the federal Government are constitutional, why then would not such restrictions, as embraced in section 17, also be constitutional when placed on judges in the judicial branch of government in a sovereign state whose decisions affect the lives and property of its citizens? We hold they are.

Appellant cites the California Supreme Court case of *Fort* v. *Civil Service Commission,* 61 Cal.2d 331 [38 Cal.Rptr. 625, 392 P.2d 385], as controlling. The *Fort* case, authored by Chief Justice Gibson,[3] is factually

---

[3]Former Chief Justice Phil S. Gibson of the California Supreme Court, a member of the California Constitutional Revision Commission, said in respect to a proposal pertaining to nonjudicial campaigns: "Another measure proposed by the State Bar and Judicial Council would eliminate from the Constitution the exception created by

distinguishable. Moreover, the *Fort* case recognized that "compelling" state purposes may restrict political activities if "not broader than are required to preserve the efficiency and integrity" of the public service in question. The connection in the instant case, between being a candidate for public office and performing the official duties of a judge, is not remote, as in *Fort*. The connection is directly related to the "efficiency and integrity" of the office of judge as heretofore discussed. The "compelling" factors absent in *Fort* are present in *Alex*.

IS SECTION 17 IMPERMISSIBLY

VAGUE, UNCERTAIN AND OVERLY BROAD?

■ Petitioner's contention in this respect does not rise to the dignity requiring a minute, verbal dissection by the judicial scalpel.[4] Applying the "plain meaning" rule to section 17, taking the language of the second sentence alone and deleting the word "however," or as written, not *in vacua*, but in context with the sentences immediately preceding and following, we hold the language to be clear, concise, direct, unequivocal, and of proper scope, meeting constitutional requirements. The language, unencumbered with superfluous verbal baggage, succinctly, understandably and adequately designates the class and actions necessary to accomplish the overall object and purpose of the provision. One of the objectives of the commission was to frame amended provisions in "modern, concise and easily understandable language." (See fn. 1.) That objective, insofar as section 17 is concerned, was accomplished.

---

a 1930 amendment that permits a Superior or Municipal Court judge to seek a non-judicial public office during his term as judge. California has been a leader in the effort to establish a nonpartisan judiciary, and we believe that the adoption of this proposal would be an important further step in this direction." (32 State Bar J. (Nov.-Dec. 1957) pp. 727, 735.)

The measure proposed *required a judge to resign upon declaration of his candidacy* —much more restrictive than the section 17 requirement to take a leave of absence without pay during his candidacy for public office.

[4]The United States Supreme Court in *CSC* v. *Letter Carriers, supra*, after tracing the legislative history and making an analysis of the language of the Hatch Act, which was infinitely more extensive and imprecise than section 17, stated 413 U.S. at pages 577-579 [37 L.Ed.2d at page 816]: ". . . There might be quibbles about the meaning of taking an 'active part in managing' or about 'actively participating in fund-raising' or about the meaning of becoming a 'partisan' candidate for office; but there are limitations in the English language with respect to being both specific and manageably brief, and it seems to us that although the prohibitions may not satisfy those intent on finding fault at any cost, they are set out in terms that the ordinary persons exercising ordinary common sense can sufficiently understand and comply with, without sacrifice to the public interest. 'The general class of offenses to which . . . [the provisions are] directed is plainly within [their] terms, . . . [and they] will not be struck down as vague, even though marginal cases could be put where doubts might arise.' *United States* v. *Harriss*, 347 U.S. 612, 618 [98 L.Ed. 989, 74 S.Ct. 808] (1954)."

The United States Supreme Court in *CSC* v. *Letter Carriers, supra,* noted 413 U.S. at page 579 [37 L.Ed.2d at page 816]: ". . . Surely, there seemed to be little question in the minds of the plaintiffs who brought this lawsuit as to the meaning of the law, or as to whether or not the conduct in which they desire to engage was or was not prohibited by the Act."

We note in the case at bench that (1) although the personal desires were to the contrary, the petitioner, a judge, a member of the class covered and the one most directly affected, (2) the officials of respondent County of Los Angeles, and (3) those in the judiciary, who have a role to play in implementation of the mandate, all had no difficulty understanding the provision. All complied.[5]

Accordingly, we hold that section 17 is neither impermissibly vague or fatally overbroad.

### Does Section 17 Impose Additional or Different Eligibility Requirements for a Federal Elective Office Rendering It Unconstitutional?

Article I, section 2, clause 2 of the United States Constitution prescribes the eligibility requirements for a congressman (House of Representatives) as follows: (1) that he be 25 years of age; (2) that he be 7 years a citizen of the United States; and (3) that he be an inhabitant of the state in which he shall be chosen.

---

[5]The petitioner, Judge Alex, filed the following affidavit which was considered by the court below and is part of the record on appeal:

"I Hereby State under affidavit of perjury that prior to taking a leave of absence on March of 1970 in order to run for Congress in the 24th Congressional District Primary, I contacted all of the Judges of the Citrus Municipal Court including the Presiding Judge at a duly constituted Judges' Meeting and advised them of my situation and desire to serve as a Municipal Court Judge using my vacation time or serving as judge pro tempore. It was all our considered opinions that the only Agency that could decide such a matter was the Judicial Council of the State of California who makes appointments of Judges sitting in such capacity.

"Therefore I wrote a letter to Mr. Kleps, Administrative Officer and to the Presiding Judge of the Supreme Court, requesting that I be allowed to continue to sit as a Judge using my vacation time or to sit as a judge pro tempore in order to help alleviate a crowded calendar.

"I was advised by the Judicial Council that I not only was required to take a leave of absence, but that I could not work in any capacity particularly as an attorney during my leave of absence or I would forfeit my Judgeship. I was also denied my request to use my vacation time or to sit as a judge pro tempore therefore I had no alternative but to take a leave of absence upon the day of filing my papers for Congress. I delayed filing my papers until the last day in order to sit as a Judge and help alleviate a crowded calendar.

"Dated: 2/25/72 [/S/] John M. Alex, Judge"

The thrust of appellant's contention is directed at the second sentence of section 17. He contends that since he had to take a leave of absence from the bench without pay, this constituted a fourth eligibility requirement to run for Congress and is therefore unconstitutional.

In *Otsuka* v. *Hite,* 64 Cal.2d 596 [51 Cal.Rptr. 284, 414 P.2d 412], the California Supreme Court said at pages 606-607: "It has long been a cardinal rule, of course, that if a provision of the California Constitution is 'capable of two constructions, one of which would cause a conflict with the federal Constitution, the other must be adopted.' (*Steinhart* v. *Superior Court* (1902) 137 Cal. 575, 579 [70 P. 629, 92 Am.St.Rep. 183, 59 L.R.A. 404].)"

We hold that section 17 of the California Constitution does not add a fourth eligibility requirement to run for Congress and may reasonably be construed in a manner consistent with article I, section 2, clause 2 of the federal Constitution for the following reasons.

First, the second sentence of section 17 must be read in context with the sentences immediately preceding and following. The first sentence reads in part: ". . . during the term for which he was selected is *ineligible* [italics added] for public employment or public office other than judicial employment or judicial office." The second sentence, in part, states: ". . . may, however, *become eligible* [italics added] for election to other public office by taking a leave of absence without pay prior to filing a declaration of candidacy." The third sentence provides that: "Acceptance of the public office is a resignation from the office of judge."

Thus, section 17 does not single out *federal* public office but applies across the board to *any* nonjudicial "public office" and does not, in fact, impose additional or different eligibility requirements for a federal elective office. What it does is spell out certain conditions and limitations, as mandated by the citizens of California, which must be complied with in order to continue serving as a municipal or superior court judge in the State of California.

Second, in the case at bench, the petitioner, a judge, was federally eligible and (A) he wanted to run for Congress; (B) he did; (C) he lost; and (D) he returned to his employment (the bench). Clearly, section 17 did not affect (A) and (C) above. As to (D), section 17, in fact, afforded him a stronger position than most candidates by assuring his former job back if he lost. His contention, therefore, is directed solely at (B) and the requirement to take a leave of absence without pay during his candidacy for a public office.

We address ourselves to (B) above. The petitioner is in no different

position and has experienced no greater hardship than innumerable candidates, successful or unsuccessful, who have aspired to any elective public office. He was confronted with the same problems which have and will confront every such aspirant. That is, each candidate must make his own plans and arrangements, financial and otherwise, to meet business and family obligations during his campaign. We are aware of no affirmative federal requirement, by constitution or otherwise, that employers, private or governmental, subsidize their (its) employees while running for elective office on the federal, state or local level. That is a matter strictly between the employer and employee. Once determining that he cannot sit on the bench while campaigning for public office, it logically follows that he should not be paid for work he is not performing.

Petitioner is a judge of his own free will. Being a judge, he must simply account for and make arrangements to cope with the requirements peculiar to his office of judge. He must accept the limitations and restrictions along with the benefits and prestige inherent to and attendant with the calling to the bench.[6]

Finally, section 17 tangentially tends not only to harmonize with, but to promote the basic doctrine of the tripartite separation of powers of government—legislative, executive and judicial, as embodied in both the federal[7] and California[8] Constitutions.

## CONCLUSION

We are living through a period of massive distrust and loss of confidence in all major institutions of government, including the judiciary.

The approximately 20 million citizens of California, speaking through the initiative process at the ballot box; the approximately 40,000 attorneys in California, speaking through the committees of the California State Bar; and the approximately 1,000 judges in California, speaking through the Judicial Council and the California Conference of Judges, want their trial judges to be free of the "suspicion" of being warped by political bias. They want their trial judges to "tend the store" and not be

---

[6]Undoubtedly petitioner was going to run for Congress irrespective of this requirement or he would have proceeded by way of writ of mandate prior to filing his candidacy.

[7]Articles I, II and III of the United States Constitution create three separate departments of government—legislative, executive and judicial.

[8]Article III of the California Constitution provides: "Separation of Powers. The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

diverted from the impartial performance of their work by extrajudicial activities such as running for public office. These desires are reflected in section 17 and thus tend to foster confidence in our courts which is indispensable.

For the reasons discussed, whether the matter at bench is before this court on appeal from an order sustaining a demurrer without leave to amend or from the granting of a motion for summary judgment,[9] we hold that appellant's contentions are nonmeritorious.

Judgment affirmed.

Lillie, Acting P. J., and Thompson, J., concurred.

On January 9, 1974, the opinion was modified to read as printed above. Appellent's petition for a hearing by the Supreme Court was denied February 7, 1974.

---

[9]This court has reviewed the complete superior court file pursuant to authority of rule 12a, California Rules of Court. The minute order of February 28, 1972, reflects in part:

". . . Pursuant to stipulation of counsel the Demurrer is deemed a Motion for Summary Judgment.

"Matters are argued, counsel stipulating as to certain facts. Petitioner's Exhibit 1 (Declaration of Judge John M. Alex, filed 2/28/72) is admitted in evidence by reference by stipulation of counsel. . . ."

The matter was submitted. The minute order of April 28, 1972, sustains the "demurrer." Appellant's opening brief appeals from the sustaining of the demurrer without leave to amend. Respondents' brief acknowledges that appellant's opening brief correctly states the nature of these proceedings, the pertinent facts and the issues to be determined.