[Civ. No. 47441. Second Dist., Div. One. July 15, 1976.]

DONALD JAMES ANDERSON, Plaintiff and Respondent, v. ROBERT C. COZENS, as Director, etc., et al., Defendants and Appellants.

**COUNSEL**

Evelle J. Younger, Attorney General, and Melvin R. Segal, Deputy Attorney General, for Defendants and Appellants.

Edwards, Edwards & Ashton and Perry D. Mocciaro for Plaintiff and Respondent.

**OPINION**

**HANSON, J.—**

### INTRODUCTION

This is an appeal by Robert C. Cozens, Director of the Department of Motor Vehicles, and the Department of Motor Vehicles, State of

California (hereinafter collectively referred to as DMV), from a judgment granting the issuance of a peremptory writ of mandate by the superior court. The court set aside a decision by DMV suspending the driving privilege of petitioner-respondent Donald James Anderson (hereinafter petitioner) for six months for his refusal to submit to one of the sobriety tests (blood, breath or urine) required by the implied consent law. (Veh. Code, § 13353 [hereinafter Section 13353].)[1]

---

[1]*Historical Background:*

Since the turn of the century when the "horseless carriage" traveled in the "ruts through sand and mud" on wagon and stagecoach roads, California motor vehicle legislation has attempted to keep pace with technological developments in motor vehicles and the increased traffic volume resulting from California's population explosion.

In 1905, the first year that vehicular registration was required, there were only 6,428 automobiles in California. Vehicular registration had increased in 1954 to 6 million; in 1960 to 8 million; in 1970 to 14 million; and in 1974 there were approximately 16,170,000 registered automobiles in California. The massive increase in vehicular technology and improved roads in California are reflected in California highway travel increase from 70 billion to 112 billion miles annually during the 1960-1970 decade.

In 1911 the California Legislature for the first time addressed itself to the drunk driving problem by adding two sections to the Penal Code making it a misdemeanor to drive while intoxicated and a felony if an intoxicated driver caused death or bodily injury.

In the 1960-1970 period the California Legislature focused not only on environmental issues and control of motor vehicle related air and noise pollution, but also on drunk drivers as one of the more important causes of accidents on California highways to take them from behind the wheels of automobiles and to facilitate their conviction. One of the dramatic steps in this regard was taken in 1966 when the Legislature enacted the so-called "implied consent" law (Veh. Code, § 13353) which provided that any person driving a motor vehicle upon a highway shall be deemed to have given his consent to a chemical test of his blood, breath or urine for the purpose of determining the alcohol content of his blood where arrested for any offense alleged to have been committed while the person was driving under the influence of intoxicating liquor. The statute provided for mandatory suspension of the person's driving privilege for six months by the Department of Motor Vehicles for refusing to submit to one of the three tests. Some safeguards were written into the law to protect the motorist, including a provision that the officer requesting the test inform the motorist that his failure to submit will result in suspension of his driving privilege. Hearing procedures were also established; along with a requirement that the California Highway Patrol, in cooperation with the Department of Public Health, adopt uniform standards for giving blood alcohol tests. (Veh. Code, § 13354.)

The 1969 legislative session made several significant changes, standardizing enforcement practices relating to the "implied consent" statute by requiring an officer to inform the individual arrested on a drunk driving charge that he had a choice of the three tests.

After several years of debate, the Legislature adopted a "presumptive limits" law which established presumptions in law relating to the percentage of alcohol in the blood of a driver as determined by chemical analysis of the blood, breath or urine, which was secured under the previously enacted "implied consent" law. A person is presumed not under the influence of intoxicating liquor if the percentage is less than 0.05. If the percentage is 0.10 or higher, the driver is presumed to be under the influence, causing the burden of proof as to his intoxication to shift. California's new law was enacted after 43

## THE CASE

The record on appeal reflects the following chronology of events:

On January 20, 1974, at approximately 8:50 p.m., California Highway Patrol Officer Billy L. Bradshaw, responding to a radio call, arrived at the scene of an accident. Two witnesses at the scene, according to the officer's report, identified petitioner as the driver of a vehicle that spun out of control and struck a power pole. Officer Bradshaw noticed petitioner had a strong odor of alcohol on his breath, was unsteady on his feet, had dilated pupils with slow reaction to light, that his speech was thick and slurred, and that he performed balance tests very poorly. Officer Bradshaw asked petitioner if he was sick or injured, to which petitioner replied in the negative.

Since petitioner did not satisfactorily perform several field sobriety tests, he was arrested for driving under the influence of alcohol in violation of Vehicle Code section 23102, subdivision (a). He was then advised of the necessity that he submit to a chemical test which he refused. Thereafter, Officer Bradshaw advised him of the "implied consent" law obligation by reading from a Highway Patrol form entitled "Officer's Statement, Section 13353 Vehicle Code," as follows: "You are required by state law to submit to a chemical test to determine the alcoholic content of your blood. You have the choice of whether the test is to be of your blood, breath or urine. If you refuse to submit to a test or fail to complete a test your driving privilege will be suspended for a period of six months. You do not have the right to talk to an attorney or to have an attorney present before stating whether you will submit to a test, before deciding which test to take or during the administration of the test chosen."

other states had adopted similar legislation, although most had established a level of 0.15. The federal standard recommends the 0.10 level. (Veh. Code, § 23126.)

In 1970 further modifications were made to the "implied consent" law requiring that a person must not only submit to a chemical blood alcohol test, but must complete the one selected or choose another test. The officer was further required to advise the arrested person that he has a choice of tests under certain circumstances, and that he does not have the right to have an attorney present before stating whether he will submit to a test, before deciding which test to take, or during administration of the test chosen.

California motor vehicle legislation from 1926 to the present has been incorporated from the Uniform Vehicle Code, the original text of which was approved in that year at the Second National Conference on Street and Highway Safety. The National Conference of Commissioners on Uniform State Laws participated in the drafting of the text of the Uniform Vehicle Code which was approved by the Commissioners and the American Bar Association. (Substantially extracted from California Motor Vehicle Legislation by Robert H. Nida, 66 West's Ann. Veh. Code (1971 ed.).)

After Officer Bradshaw read the above to petitioner, he asked the following questions of petitioner and petitioner's answers were recorded on the form (Exhibit A to DMV's answer to petition for writ of mandamus):

"Q. Do you understand what I just read to you? A. Yes. Q. Will you take a breath test? A. No. Q. Will you take a blood test? A. No. Q. Will you take a urine test? A. I ain't takin' no fucking test. Q. Do you understand that DMV is going to suspend your driver's license if you do not take a test? A. Fuck 'em." The above form, duly dated and signed by Officer Bradshaw, was submitted to the DMV who, on February 11, 1974, under authority of Vehicle Code Section 13353, subdivision (b), ordered petitioner's driver's license suspended for a six-month period effective February 25, 1974.

Petitioner, having been served with the order of suspension and notice of his right to a formal or informal hearing, requested a "formal" hearing pursuant to Vehicle Code section 14107. DMV stayed suspension of petitioner's driver's license until further notice and on March 22, 1974, conducted a "formal" hearing at the DMV office in Pomona before Hearing Officer Referee Shappi; persons present were petitioner, his counsel and the arresting officer, Bradshaw.[2]

Arresting Officer Bradshaw testified at the hearing substantially as described above.

Petitioner testified under direct examination by his counsel that he "had maybe a couple of beers during the afternoon" but nothing that evening; that he was looking for a gas station and was going to turn into a driveway on the opposite side of the road to turn around, and as he started "to enter the center of the road a car sped by" causing him to cut back to his right and as he did "a cat or dog or rabbit or whatever jumped off the curb" and he "cut the wheel again to the right and slid into the pole"; that he injured his left and right knees and head; and that he may have been unconscious for "a few seconds."

Petitioner first testified that the officer instructed him to take a series of field sobriety tests which he "thought he did considerably well"

---

[2]Pursuant to California Rules of Court, rule 12a, we have ordered up the complete superior court file and have read the transcript of the formal hearing at the DMV which was recorded on a cassette tape.

considering that his "knees were pretty banged up," and then testified that he did not recall Officer Bradshaw's instructions as to how to take the test. He recalled being placed in the patrol car and first testified that he did not recall Officer Bradshaw reading any statement regarding his choice of chemical tests, then later testified that the officer did not read a statement from any form. He testified the officer said there were three tests that he could take but didn't recall his answer; that the officer said his driver's license could be suspended for failure to take a test and did not understand that suspension would be mandatory if he refused; that if he knew his license would be automatically suspended for failure to take a test he would not have refused. Petitioner denied ever saying "I aint' takin' no fucking tests" as they were not typical words used by him but sounded "like something out of a western movie."

Referee Shappi questioned petitioner to clarify his testimony since he first testified that he did not "recall" the officer reading a statement to him and later testified that the officer "did not" read anything to him. The referee also inquired into the injuries petitioner sustained as a result of striking the pole.

Following the hearing and written argument, Referee Shappi made the following findings, among others:

"a. That Donald James Anderson was lawfully arrested;

"b. That the officer had reasonable cause to believe that Donald James Anderson had been driving a motor vehicle upon a highway while under the influence of intoxicating liquor;

"c. That Donald James Anderson was told his driving privilege would be suspended for six (6) months if he refused to submit to a chemical test;

"d. That Donald James Anderson refused to submit to any chemical test of his blood, breath or urine after being requested to do so by a police officer."

On June 14, 1974, Robert C. Cozens, Director of DMV, adopted the decision of Referee Shappi as his own and suspended petitioner's driver's license for a six-month period commencing June 24, 1974.

On September 27, 1974, petitioner filed a "Petition for Writ of Mandamus," alleging, among other things, (1) that the DMV failed to give him a fair and impartial hearing denying constitutional right of due process, over his objections, in that the hearing officer was neither a lawfully appointed judge nor an attorney at law, conducted examination of witnesses and ruled on objections and objected to questions put by his counsel and acted as an "advocate" contrary to the interests of petitioner; (2) that the DMV resolved a factual issue contrary to the interest of petitioner without any clean-cut or substantial evidence supporting it; (3) that he was never advised that a failure to submit to a chemical test would "automatically" cause a suspension of his driver's license, but only that it "could" be suspended; (4) that the district attorney's office dismissed the charge of violation of Vehicle Code section 23102, subdivision (a), and he pleaded guilty to violation of Vehicle Code section 23103 (reckless driving) with court approval; and (5) that if his driver's license suspension is enforced he will lose his job because he is a truck driver.

No testimony was offered in the superior court and the court's findings and judgment are based on the transcript of the testimony at the hearing before the DMV and the documents that were made part of that record.

On June 17, 1975, the superior court in its findings and conclusions recited the events substantially as hereinbefore described as the contentions of the parties and granted the peremptory writ of mandate, not on factual grounds but on the following "Conclusions of Law":

"1. The possession by petitioner of a driver's license is a valuable right and a deprivation of said license by the Department of Motor Vehicles is a sanction and a taking of property. . . . [which] requires that it be done with regard to the mandate of the 14th Amendment of the United States Constitution. . . . Such mandate requires both the concept of due process and the concept of equal protection. This Court cannot find that due process in this hearing was violated, when taken within the limited frame of reference of driver license revocations, but does find that said hearings were not conducted in the same manner as in similar proceedings involving state agencies in California, which allow other defendants and other litigants in administrative hearings the right to have the matter heard by an impartial administrative officer with the qualifications and under the rules as set forth in the California Administrative Code, and that thus denies petitioner the equal protection required of the 14th Amendment.

"2. The Court finds that there is no reasonable classification separating driver litigants who are losing their licenses from other litigants losing other state granted licenses and property rights.

"3. The Court also is of the opinion that hearings conducted by an officer who is an employee of the Department seeking to revoke the petitioner's license and who therefore is subject to the executive pressures of being an employee, cannot act free of the influences [sic] which is given to administrative officers who are independent of the revoking departments. This constitutes to him a denial of equal protection; it also acts to deny him the due process given other litigants in the State of California."[3]

## ISSUE

■ ■■■■ The court below did not grant the writ of mandate in favor of petitioner on evidentiary grounds[4] but on constitutional grounds.

The court below in granting the writ of mandate in favor of petitioner did not find "that due process . . . was violated . . . within the limited frame of reference of driver license revocation." The apparent thrust of the trial court's reason for granting the writ was based on the premise that the denial of the hearing by an "impartial administrative officer with the qualifications and under the rules as set forth in the California Administrative Code" constituted a denial of the equal protection clause of the Fourteenth Amendment since other litigants facing the loss of state-granted licenses issued by state agencies other than DMV are entitled to a hearing under the California Administrative Code.

---

[3]The superior court commanded the DMV to conduct a hearing consistent with the requirements set forth above or be permanently stayed from suspending petitioner's driver's license, and granted costs of suit in the sum of $57.60 to petitioner.

[4]The superior court in reviewing a DMV order suspending a driver's license pursuant to section 13352 employs the independent judgment test, while the appellate court in reviewing the superior court's findings, employs the substantial evidence test. (*James* v. *Dept. of Motor Vehicles* (1968) 267 Cal.App.2d 750 [73 Cal.Rptr. 452].)

At the hearing before Referee Shappi, Officer Bradshaw testified to evidentiary facts which led him to conclude that petitioner herein was intoxicated and petitioner's response to his queries in respect to taking one of the three blood-alcohol tests. Those evidentiary facts were sufficient to support the hearing officer's findings. No additional testimony was offered in the superior court and, apparently applying the independent judgment rule on the evidence, by implication the court below found the evidence supported the DMV's decision of suspension.

On review we hold there is substantial evidence to support the superior court's implied finding that the evidence supported the DMV's order of suspension.

## DISCUSSION

The California "implied consent" statute (Section 13353)[5] has repeatedly withstood assault on constitutional grounds.

---

[5]The California "implied consent" statute, Section 13353 (enacted in Stats. 1966 as amended by Stats. 1969 and 1970) in pertinent part provides:

"(a) Any person who drives a motor vehicle upon a highway shall be deemed to have given his consent to a chemical test of his blood, breath or urine for the purpose of determining the alcoholic content of his blood if lawfully arrested for any offense allegedly committed while the person was driving a motor vehicle under the influence of intoxicating liquor. The test shall be incidental to a lawful arrest and administered at the direction of a peace officer having reasonable cause to believe such person was driving a motor vehicle upon a highway while under the influence of intoxicating liquor. Such a person shall be told that his failure to submit to or complete such a chemical test will result in the suspension of his privilege to operate a motor vehicle for a period of six months.

"The person arrested shall have the choice of whether the test shall be of his blood, breath or urine, and he shall be advised by the officer that he has such choice. If the person arrested either is incapable, or states that he is incapable, of completing any chosen test, he shall then have the choice of submitting to and completing any of the remaining tests or test, and he shall be advised by the officer that he has such choice.

"Such person shall also be advised by the officer that he does not have the right to have an attorney present before stating whether he will submit to a test, before deciding which test to take, or during administration of the test chosen.

"Any person who is dead, unconscious, or otherwise in a condition rendering him incapable of refusal shall be deemed not to have withdrawn his consent and such tests may be administered whether or not such person is told that his failure to submit to or complete the test will result in the suspension of his privilege to operate a motor vehicle.

"(b) If any such person refuses the officer's request to submit to, or fails to complete, a chemical test, the department, upon receipt of the officer's sworn statement that he had reasonable cause to believe such person had been driving a motor vehicle upon a highway while under the influence of intoxicating liquor and that the person had refused to submit to, or failed to complete, the test after being requested by the officer, shall suspend his privilege to operate a motor vehicle for a period of six months. No such suspension shall become effective until 10 days after the giving of written notice thereof, as provided for in subdivision (c).

"(c) The department shall immediately notify such person in writing of the action taken and upon his request in writing and within 15 days from the date of receipt of such request shall afford him an opportunity for a hearing in the same manner and under the same conditions as provided in Article 3 (commencing with Section 14100) of Chapter 3 of this division. For the purposes of this section the scope of the hearing shall cover the issues of whether the peace officer had reasonable cause to believe the person had been driving a motor vehicle upon a highway while under the influence of intoxicating liquor, whether the person was placed under arrest, whether he refused to submit to, or failed to complete, the test after being requested by a peace officer, and whether, except for the persons described in paragraph (a) above who are incapable of refusing, he had been told that his driving privilege would be suspended if he refused to submit to, or failed to complete, the test."

The remainder of the section sets forth provisions for administrative hearings on threatened suspension, persons exempt from blood-alcohol tests for medical reasons, and requests by vehicle operators for tests. The scope of the hearing includes the issue of whether the arrestee refused to submit to the test.

For example, it is now well settled that the statutory scheme and the procedures employed by the DMV, as required by Section 13353, satisfy procedural due process requirements. The landmark and much cited cases of *Finley* v. *Orr* (1968) 262 Cal.App.2d 656 [69 Cal.Rptr. 137] [ptn. for a hg. by the Supreme Court den. July 31, 1968], and *Serenko* v. *Bright* (1968) 263 Cal.App.2d 682 [70 Cal.Rptr. 1] [ptn. for hg. by the Supreme Court den. Sept. 5, 1968], held that the procedures for suspending a motorist's license pursuant to Section 13353 meet due process requirements containing all the elements of rudimentary fairness and with the added protection of adequate judicial review.

It is also well settled that hearing officers of the DMV, such as Referee Shappi in the instant case,[6] are not required to be attorneys, the provisions of the Administrative Procedure Act (Gov. Code, § 11500 et seq.) not being applicable to hearings conducted under the provisions of Vehicle Code section 14107 which meets due process requirements. (See *Serenko* v. *Bright, supra; Reirdon* v. *Director of Dept. of Motor Vehicles* (1968) 266 Cal.App.2d 808 [72 Cal.Rptr. 614]; *Funke* v. *Department of Motor Vehicles* (1969) 1 Cal.App.3d 449 [81 Cal.Rptr. 662]; *Lacy* v. *Orr* (1969) 276 Cal.App.2d 198 [81 Cal.Rptr. 276]; *Cameron* v. *Cozens* (1973) 30 Cal.App.3d 887, 889 [106 Cal.Rptr. 537]; *Department of Motor Vehicles* v. *Superior Court* (1969) 271 Cal.App.2d 770 [76 Cal.Rptr. 804]; *Noll* v. *Department of Motor Vehicles* (1969) 274 Cal.App.2d 281 [79 Cal.Rptr. 236]; *Westmoreland* v. *Chapman* (1968) 268 Cal.App.2d 1, 4-5 [74 Cal.Rptr. 363]; *Fankhauser* v. *Orr* (1968) 268 Cal.App.2d 418, 423 [74 Cal.Rptr. 61].)

Moreover, case law has established that in a civil proceeding for suspension of one's driving privilege under section 13353 the chemical tests do not violate one's right against self-incrimination (*Schmerber* v. *California* (1966) 384 U.S. 757 [16 L.Ed.2d 908, 86 S.Ct. 1826]; *People* v. *Sudduth* (1966) 65 Cal.2d 543 [55 Cal.Rptr. 393, 421 P.2d 401]; *United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Finley* v. *Orr, supra,* 262 Cal.App.2d 656; *Walker* v. *Department of Motor Vehicles* (1969) 274 Cal.App.2d 793 [79 Cal.Rptr. 433]), nor one's right to be free from

---

[6]Here, the transcript of the formal hearing reflects that Referee Shappi conducted an orderly proceeding, was courteous to petitioner and his counsel, properly ruled on petitioner's counsel's objections, and afforded petitioner's counsel a wide scope of cross-examination of Officer Bradshaw. The referee's examination of petitioner and inquiry of the witnesses were for the purpose of clarifying their testimony as any trier of fact, judge, arbitrator or referee is entitled to do, and were therefore proper. Moreover, petitioner's counsel did not object to any of the referee's questions.

unreasonable search and seizure (*Schmerber* v. *California, supra*), nor one's right to counsel during the taking of the chemical blood-alcohol tests (*Smith* v. *Department of Motor Vehicles* (1969) 1 Cal.App.3d 499 [81 Cal.Rptr. 800]; *Westmoreland* v. *Chapman, supra; Wethern* v. *Orr* (1969) 271 Cal.App.2d 813 [76 Cal.Rptr. 807]; *Walker* v. *Department of Motor Vehicles, supra; West* v. *Department of Motor Vehicles* (1969) 275 Cal.App.2d 908 [80 Cal.Rptr. 385]; see also *Reirdon* v. *Director of Dept. of Motor Vehicles, supra,* 266 Cal.App.2d 808; *Ent* v. *Department of Motor Vehicles* (1968) 265 Cal.App.2d 936 [71 Cal.Rptr. 726]; *Fallis* v. *Dept. of Motor Vehicles* (1968) 264 Cal.App.2d 373 [70 Cal.Rptr. 595]; *Finley* v. *Orr, supra,* 262 Cal.App.2d 656 (hg. den.); *Plumb* v. *Department of Motor Vehicles* (1969) 1 Cal.App.3d 256 [81 Cal.Rptr. 639]).[7]

Turning to the case at bench and the conclusion by the trial court that Section 13353 violated the equal protection clause of the Fourteenth Amendment,[8] we note that Section 13353 withstood similar constitutional attacks based on different rationale in the cases of *Walker* v. *Department of Motor Vehicles, supra,* 274 Cal.App.2d 793, and in *Pepin* v. *Department of Motor Vehicles* (1969) 275 Cal.App.2d 9 [79 Cal.Rptr. 657].

In *Walker,* the court was faced with the contention that the DMV's suspension of the petitioner's driver's license under Section 13353 denied him equal protection of the law by reason that the license suspension is automatic for the driver who refuses the blood-alcohol test but discretionary for the driver who takes the test and is found to be under the influence of alcohol. In respect to the petitioner's contention in that case, the court said at page 796:

"The Legislature had a sufficient reason for requiring a chemical test, and for providing a simple administrative sanction to enforce that requirement. The combination of criminal punishment and administrative sanctions which are imposed upon a person convicted of drunk driving (see Veh. Code, §§ 23102, 13210, 13352) serve a different purpose and, in a particular case, may be more or less onerous than the sanction imposed under section 13353.

---

[7]In addition, it has been held that being too drunk to understand the full import of Section 13353 at the time of refusal is no defense (*Fankhauser* v. *Orr, supra,* 268 Cal.App.2d 418), and that silence in the face of repeated requests to submit to a chemical test constitutes a "failure to submit" within the meaning of Section 13353 (*Lampman* v. *Department of Motor Vehicles* (1972) 28 Cal.App.3d 922 [105 Cal.Rptr. 101]).

[8]The Fourteenth Amendment to the federal Constitution provides, in part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

"The classes are different. All who refuse the chemical test are subject to the sanction of section 13353, and all who drive under the influence are subject to the penalties provided for that offense. A driver may fall into either class, or neither or both, and will receive the treatment which the law provides for the class or classes in which he places himself. (See *August* v. *Department of Motor Vehicles* (1968) 264 Cal.App.2d 52, 67 [70 Cal.Rptr. 172].)"

In *Pepin,* petitioner asserted that because Section 13353 does not permit an exception for "employment-livelihood" cases, similar to that of Vehicle Code section 13210, he was denied equal protection of the law. In declaring the assertion unmeritorious, the court stated at page 11: "The issue is whether section 13353 arbitrarily discriminates against certain classes of persons who refuse to take the chemical test, as opposed to other classes who also refuse the test. No discrimination exists. No particular class of person is selected for suspension for refusing a chemical test. The suspension is mandatory, not discretionary.

"Pepin did not have a constitutional right to refuse to take the chemical test (*Finley* v. *Orr,* 262 Cal.App.2d 656, 662-663 [69 Cal.Rptr. 137])."[9]

█ Here, apparently the rationale advanced by the court below for holding that Section 13353 violates the equal protection clause is that holders of motor vehicle driving licenses are not afforded hearing procedures under the Administrative Procedure Act, as afforded other persons facing a license suspension or revocation where their licenses have been issued by state agencies other than the DMV.[10] We reject this assertion as unmeritorious and hold Section 13353 does not violate the equal protection clause.

[9]The *Walker* and *Pepin* cases dispose of petitioner's complaint to the court below and in his brief on appeal in the instant case that suspension of his driver's license will result in the loss of his employment as a truck driver. The suspension is mandatory by operation of law.

[10]"The Administrative Procedure Act is a general law relating to administrative procedure in hearings and by established precedent such regulations must yield to special statute where a variance exists. Hearings before the Department of Motor Vehicles are controlled by the provisions of Vehicle Code section 13353 itself, and the department's hearing procedures are specified within the Vehicle Code (§§ 14100-14112) rather than the Administrative Procedures [*sic*] Act (Gov. Code, § 11500 et seq.)." (*Serenko* v. *Bright, supra,* 263 Cal.App.2d at p. 689.)

"Case law has developed a two-level standard in evaluating legislative classifications under the 'equal protection' clause. The traditional test is that there is a presumption of constitutionality which will not be overthrown by the courts unless it is palpably arbitrary and beyond rational and reasonable doubt erroneous and no set of facts reasonably can be conceived that would sustain it. This traditional test is usually applied to 'economic' regulations.

"The other, and stricter, standard is employed in cases involving 'suspect classifications' or 'fundamental interests.' Here the courts take a close look at the classification and require not only a *compelling* state interest which justifies the law, but also that the distinctions drawn by the law are *necessary* to further its purpose. (*In re Antazo,* 3 Cal.3d 100 [89 Cal.Rptr. 255, 473 P.2d 999]; *California State Employees' Assn.* v. *Flournoy,* 32 Cal.App.3d 219 [108 Cal.Rptr. 251].)" ·(Original italics.) (*Alex* v. *County of Los Angeles* (1973) 35 Cal.App.3d 994, 1000-1001 [111 Cal.Rptr. 285].)

Here, the reasonable, compelling and legitimate state purposes for Section 13353 are both immediate and long-range in nature. The immediate purpose is to obtain the best evidence of blood-alcohol content at the time of the arrest of a person reasonably believed to be driving while intoxicated (see *Zidell* v. *Bright* (1968) 264 Cal.App.2d 867· [71 Cal.Rptr. 111]) and to avoid the possible violence which could erupt if forcible tests were made upon a recalcitrant and belligerent inebriate in order to obtain that best evidence (see *People* v. *Fite* (1968) 267 Cal.App.2d 685 [73 Cal.Rptr. 666]; *Zidell* v. *Bright, supra,* at p. 870; *Funke* v. *Department of Motor Vehicles, supra,* 1 Cal.App.3d at p. 454).

The long-range purpose of Section 13353 is to inhibit intoxicated persons from driving on the highways (*Finley* v. *Orr, supra,* 262 Cal.App.2d 656; *Zidell* v. *Bright, supra,* 264 Cal.App.2d 867) and thus reduce the carnage and slaughter on California freeways and byways caused by drunk drivers (*Bush* v. *Bright* (1968) 264 Cal.App.2d 788 [71 Cal.Rptr. 123]; *Funke* v. *Department of Motor Vehicles, supra,* 1 Cal.App.3d 449) which "now reaches the astounding figures only heard of on the battlefield" (*Breithaupt* v. *Abram* (1957) 352 U.S. 432, 439 [1

L.Ed.2d 448, 453, 77 S.Ct. 408]; *People* v. *Fite, supra,* 267 Cal.App.2d 685).[11]

The reasonable and compelling purpose of having the hearings under the self-contained umbrella of the DMV—time-wise, cost-wise and otherwise—becomes evident when the death and injury rate resulting from drunk drivers is considered in conjunction with the over 16 million motor vehicles being operated on California highways and compared to the relatively miniscule number of licenses issued by other state agencies which do not involve the operation of instruments of death at high speeds on our highways.

Accordingly, inasmuch as there is no constitutional requirement of absolute uniform treatment, but only that there be a reasonable basis for each classification, and applying the stricter test, we hold that the above described *compelling* state interest justifies Section 13353, and any distinctions drawn between persons holding driver's licenses and other state-agency-issued license holders are *necessary* to further the overall purposes of the California "implied consent" statute.[12]

---

[11]To accomplish the immediate and long-range purposes the Legislature designed Section 13353 with two separate and immediate objectives in mind; namely, "(1) to secure chemical tests for determining whether or not a person was intoxicated while driving a motor vehicle and to allow introduction of such evidence into court; and (2) to provide an administrative penalty for those drivers who refuse to comply. . . . [I]t is clear that the administrative penalty imposed upon a licensee who drives a motor vehicle while drunk upon the highways of this state is in addition to, and separate and apart from, the penalty imposed by said section 23101." (*People* v. *Fite, supra,* at p. 691.)

[12]Petitioner's contention that since the charge of Vehicle Code section 23102, subdivision (a) (misdemeanor drunk driving), was dismissed and he pleaded guilty to Vehicle Code section 23103 (reckless driving), Section 13353 is inoperative, is incorrect. The facts in *Spurlock* v. *Department of Motor Vehicles* (1969) 1 Cal.App.3d 821 [82 Cal.Rptr. 42], are similar to the case at bench, in that petitioner-motorist was involved in a collision with a signal-light pole, refused to take one of the chemical sobriety tests required by Section 13353, and subsequently pleaded guilty to a hit-and-run charge (Veh. Code, § 20002) with the charges of misdemeanor drunk driving being dismissed. The Court of Appeal, in affirming the superior court's upholding of DMV's finding and order suspending her driver's license for six months, stated at pages 829-830:

"Initially, it must be noted that Vehicle Code, section 13353, authorizes the suspension of an individual's driver's license for failure to submit to the sobriety tests without any finding that the individual is, in fact, intoxicated.

"In *Walker* v. *Department of Motor Vehicles,* 274 Cal.App.2d 793 [79 Cal.Rptr. 433], the Court of Appeal held that the procedure required by section 13353 is consistent with due process. 'The Legislature had a sufficient reason for requiring a chemical test, and for providing a simple administrative sanction to enforce that requirement. The combination of criminal punishment and administrative sanctions which are imposed upon a person convicted of drunk driving (see Veh. Code, §§ 23102, 13210 and 13352) serve a different purpose and, in a particular case, may be more or less onerous than the sanction imposed under section 13353.' "

## DISPOSITION

The judgment is reversed with directions to enter judgment denying the writ of mandate.

Lillie, Acting P. J., and Thompson, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 6, 1976.