[Civ. No. 19506. Fourth Dist., Div. Two. Oct. 4, 1978.]

TERRENCE MARTIN MURPHY, Plaintiff and Appellant, v.
DEPARTMENT OF MOTOR VEHICLES et al.,
Defendants and Respondents.

**COUNSEL**

Charles Elwyn Karpinski for Plaintiff and Appellant.

Evelle J. Younger, Attorney General, and John J. Crimmins, Deputy Attorney General, for Defendants and Respondents.

**OPINION**

THE COURT.—Upon being arrested for drunk driving, Murphy refused to submit to any of the chemical tests required by the implied consent law which led to suspension of his driving privilege for the statutory period. Murphy appeals from the denial below of his petition for writ of mandate.

Murphy claims to earn his living as a truck driver. The heart of his complaint is that the suspension of the driving privilege under the implied consent law makes no exception to allow occupational driving and therefore Murphy not only is to lose his driving privilege but he also will lose his right to his employment. He thus urges various theories

which would limit suspension to so-called recreational driving and allow him to continue his occupational driving.[1]

■ Vehicle Code section 13353, subdivision (b) specifically states that upon refusal to submit to a chemical test, assuming all the proper procedures and advisements, the department "shall suspend his privilege to operate a motor vehicle." The legislative mandate is clear, unambiguous and unequivocal that the privilege of driving is suspended. There is simply no room in the legislative direction to interpret a distinction in the language between occupational driving and recreational driving. The department was left with no discretion to pick and choose between types of driving purposes.

If the statute is to allow for retention of the driving privilege for occupational purposes, the Legislature must amend the implied consent law. It simply is beyond the right and the power of this court to legislate. We may, however, consider defects in enactments and determine legislative intent.

Here the uniform application of the suspension is a legislative intent apparent on the face of the statute. In fact, it would be ridiculous to opine that the Legislature was unaware of occupational driving at the time of the statutory adoption for such a state of affairs is a matter of common knowledge.[2] In fact, there are many who argue that in most areas of California the automobile is a necessity of life.[3]

---

[1]At the department hearing there was no evidence that Murphy was a professional truck driver or that he was employed or that he had ever driven as an occupation. At the time of the incident Murphy was driving his own four-wheel drive truck, returning home from a round of golf followed by cards and liquor.

[2]Occupational driving is not limited to truck drivers. Others employed solely to drive would include, for example, taxi drivers, bus drivers, chauffeurs and the like. Other employment activities also include a primary necessity to drive as an integral part of some other employment purpose. This occupational driving group would include real estate salesmen, insurance salesmen, dealer sales representatives, process servers, some police officers and firemen, some mailmen, home repairmen of all sorts, utility company field personnel, ambulance drivers, animal control officers, gardeners and so forth *ad nauseam.* Partial occupational driving also exists such as demonstration driving by vehicle salesmen and test driving by vehicle repairmen. Finally, we are sure that some would argue that occupational driving should also include those that simply cannot get to work without driving (assuming no one to drive them, no available public transport and/or no money to pay for transport).

[3]Murphy has returned in argument to a bygone era when a professional driver needed a special chauffeur's license. The special chauffeur's license statutory provisions were repealed years prior to enactment of the implied consent law. It therefore follows that when Vehicle Code section 13353 was adopted the Legislature did not have in mind the

■ In addition to relying on legislative intent arguments, Murphy contends that the mandatory suspension provision is defective in that it violates the state and federal concepts of equal protection.

Murphy concedes that existing case authority holds that the implied consent law does not violate equal protection. He argues that the conclusion is wrong.

In *Pepin* v. *Department of Motor Vehicles,* 275 Cal.App.2d 9 [79 Cal.Rptr. 657], the court addressed the equal protection argument in the occupational driving setting. "Pepin unmeritoriously asserts that because section 13353 does not permit an exception for 'employment-livelihood' cases, similar to that of Vehicle Code, section 13210, he is denied the equal protection of the laws. The issue is whether section 13353 arbitrarily discriminates against certain classes of persons who refuse to take the chemical test, as opposed to other classes who also refuse the test. No discrimination exists. No particular class of person is selected for suspension for refusing a chemical test. The suspension is mandatory, not discretionary." (At p. 11.)

In *Anderson* v. *Cozens,* 60 Cal.App.3d 130 [131 Cal.Rptr. 256], relying on *Pepin* and *Walker* v. *Department of Motor Vehicles,* 274 Cal.App.2d 793 [79 Cal.Rptr. 433], the court summarily rejected the complaint that suspension would result in loss of employment as a truck driver. (At p. 142, fn. 9.)

Of *Pepin,* Murphy says the court mistakenly equated mandatory enforcement with equal treatment. He argues that the mandatory enforcement creates the unequal treatment for in some cases the effect on the individual is the inability to pleasure drive while in other cases it deprives one of his livelihood. This, he says, is an impermissible equal protection violation because it results in hardship of substantially varying degrees.

First it should be noted that the purposes of the implied consent law include discouraging drunk driving and getting the drunk drivers off the California roads. The law is not limited to getting the drunk pleasure drivers off the roads. Aptly *Cook* v. *Bright,* 208 Cal.App.2d 98 [25 Cal.Rptr. 116], observed: "We are wholly unable to perceive what

former distinction in licenses and thus did not intend application of the new law to nonprofessional driving only. Furthermore, the implied consent law is directed at the driving privilege rather than driver's license classifications.

consolation a victim of a drunken driver would derive from the fact that he had been maimed by a driver in quest of pleasure rather than one engaged in his employment." (At p. 104.)

The department observes that what Murphy actually advocates is that truck and other occupational drivers be accorded mandatory special driving privileges for occupational driving. This is the concept which was rejected in *Cook* v. *Bright, supra.*

The *Cook* case involved mandatory suspension of the driving privilege under Vehicle Code section 13352, subdivision (e) for three drunk driving convictions within a ten-year period. Mr. Cook argued the same distinction between occupational and recreational driving as presented here by Murphy. In rejecting the argument that occupational driving should be permitted, the court said that "[s]ince the Legislature has seen fit not to trust repeated drunken drivers to operate their vehicles under restricted licenses while engaged in their employment, this court certainly will not determine that such persons have a constitutional right to be thus trusted." (Pp. 103-104.) The same holds true for the matter before us.

We think that *Pepin, supra,* properly disposes of the equal protection argument. To adopt Murphy's view of equal protection could well pull the teeth of the implied consent law—a result with which many drunk drivers would be happy. We refer to our footnote number 2, *ante,* which suggests a vast potential for turning loose a horde of occupational drivers onto our roads who have chosen to drink and drive. The fact that it is an occupational driver who chooses to drive while drunk, whether or not on an occupational errand, and then fails to comply with the implied consent law, causes even greater reason for suspending the driving privilege. It is the occupational driver who spends more time on the road. And what assurance is there that the occupational driver only imbibes and drives while pursuing matters involving only nonoccupational driving?

Not only is there no equal protection violation here but there is the strongest of reasons not to carve out a special exculpatory exception for occupational drivers.

Murphy draws our attention to the policy of the courts to exercise special caution when dealing with the deprivation of one's livelihood. Four times Murphy was advised that failure to submit and complete a test would result in suspension of his driving privilege. Four times Murphy refused. Murphy's response was that "I may lose my license but

you are going to lose this in court." It was Murphy that chose to lose his driving privilege, not the arresting officer, the department or the courts. We again borrow from *Cook, supra*: "Petitioner's final argument is that 'the arbitrary action of respondent has deprived petitioner of a right as well as a privilege.' As previously indicated, the action of the department was not '*arbitrary*,' but by law was '*mandatory*.' The gist of petitioner's argument herein, however, is that today the vehicular use of the public highways by a man in his occupation is a necessity, and that he has a '*right*' thereto as well as a '*privilege*.' Without being drawn into semantic niceties, it is sufficient to say that whatever 'right' petitioner had ended when he thrice abused it." (At p. 103.) Similarly, here, Murphy's *knowing* refusal to submit ended the equities of his argument.

The contentions raised are simply unmeritorious. Affirmed.