Susan THORSTED; William First; and Timothy S. Zenk, Plaintiffs,

v.

Christine O. GREGOIRE; and Ralph Munro, Defendants,

and

Sherry Bockwinkel; Limit; Citizens for Term Limits; U.S. Term Limits; Alan M. Gottlieb; Lee Gill; and Wilbur B. McPherson, Intervenors Defendants.

Margaret COLONY; League of Women Voters of Washington; George Cheek; John Clute; and Thomas Foley, Plaintiffs,

v.

Ralph MUNRO; and Christine O. Gregoire, Defendants,

and

Sherry Bockwinkel; Limit; Citizens for Term Limits; U.S. Term Limits; Alan M. Gottlieb; Lee Gill; and Wilbur B. McPherson, Intervenors Defendants.

Nos. C92–1763WD, C93–770WD.

United States District Court, W.D. Washington, at Seattle.

Feb. 10, 1994.

---

Glen K. Thorsted, Bellevue, WA, for Susan Thorsted, William First, Timothy S. Zenk.

Fredric C. Tausend, Paul J. Lawrence, Stephen A. Smith, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, WA, for Margaret Colony.

Stephen A. Smith, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, WA, for League of Women Voters of Washington, George Cheek, John Clute, Thomas Foley.

John Maurice Groen, Pacific Legal Foundation, Bellevue, WA, Deborah J. La Fetra, Pacific Legal Foundation, Sacramento, CA, for Citizens for Term Limits.

Jeffrey T. Even, Atty. General's Office, Olympia, WA, James Kendrick Pharris, Atty. General's Office, Olympia, WA, for Kenneth O. Eikenberry, State of Wash., Ralph Munro.

Richard Andrew Derham, Davis Wright Tremaine, Seattle, WA, John G. Kester, Williams & Connolly, Washington, DC, for U.S. Term Limits, Alan M. Gottlieb, Lee Gill, Wilbur B. McPherson.

Kevin J. Hamilton, Thomas More Kellenberg, Perkins Coie, Seattle, WA, for American Civ. Liberties Union of Washington (ACLU), amicus.

David C. Stewart, Oles, Morrison & Rinker, Seattle, WA, for WA Legal Foundation, amicus.

Richard Andrew Derham, Davis Wright Tremaine, Seattle, WA, for Taxpayers United for Term Limits, amicus, Ronald D. Rotunda, amicus.

Herbert E. Wilgis, III, Preston, Thorgrimson, Shidler, Gates & Ellis, Seattle, WA, Lloyd N. Cutler, Wilmer, Cutler & Pickering, Washington, DC, for Henry J. Hyde, amicus.

Wallace M. Rudolph, pro se.

Shawn T. Newman, James Martin Johnson, Olympia, WA, Cleta Deatherage Mitchell, Washington, DC, Griffin B. Bell, King & Spalding, Atlanta, GA, Polly J. Price, King & Spalding, Washington, DC, for Limit (Sponsor of Initiative 573).

Shawn T. Newman, James Martin Johnson, Olympia, WA, Cleta Deatherage Mitchell, Washington, DC, Griffin B. Bell, King & Spalding, Atlanta, GA, Polly J. Price, James D. Miller, King & Spalding, Washington, DC, for Sherry Bochwinkel.

Sherry Bochwinkel, pro se.

## ORDER ON DISPOSITIVE MOTIONS

DWYER, District Judge.

## I. INTRODUCTION

These consolidated cases are of fundamental importance to the structure of representative government in the United States. At issue is the constitutionality of a state law designed to prevent incumbents who have served for a specified number of years from winning re-election to the United States Senate or House of Representatives.

On November 3, 1992, the voters of the State of Washington approved Initiative Measure 573 by a margin of about fifty-two to forty-eight percent. (The measure failed, by a similar margin, in the state's Fifth Congressional District, represented by plaintiff Thomas Foley, who is Speaker of the House of Representatives.) Under Article II, §§ 1 and 1(a) of the Washington Constitution, Initiative 573 became law thirty days after its passage, and is now codified at Revised Code of Washington ("RCW") Ch. 29. It provides in relevant part:

Sec. 4. A new section is added to chapter 29.68 RCW to read as follows:

No person is eligible to appear on the ballot or file a declaration of candidacy for the United States house of representatives who, by the end of the then current term of office will have served, or but for resignation would have served, as a member of the United States house of representatives during six of the previous twelve years.

Sec. 5. A new section is added to chapter 29.68 RCW to read as follows:

No person is eligible to appear on the ballot or file a declaration of candidacy for the United States senate who, by the end of the then current term of office will have served, or but for resignation would have served, as a member of the United States senate during twelve of the previous eighteen years.

Other sections provide that the Washington Secretary of State shall not accept a declaration of candidacy from a person who "is ineligible for the office" under the Initiative, nor allow such person's name to appear on the ballot (Section 7); that one who is ineligible to appear on the ballot or file a declaration of candidacy may run a write-in campaign (Section 6); that no terms or years served in office before November 3, 1992, may be used to determine eligibility (Section 7); and that Sections 4 and 5, regarding candidates for federal legislative office, are not effective until at least nine other states have passed similar measures (Section 7). The latter condition has been met.

The full text of Initiative 573 is set out in Appendix A to this order. Only the parts governing candidacies for the two houses of Congress are challenged here; no ruling on the provisions relating to State of Washington offices is sought or made.

The plaintiffs, who are or represent registered voters in Washington, and one of whom is a member of the House of Representatives, allege that Initiative 573's restrictions on candidacies for Congress are invalid under Article I, §§ 2 and 3, of the United States Constitution, and under the First and

Fourteenth Amendments. They seek a declaratory judgment and an order enjoining defendants Ralph Munro and Christine Gregoire, the Washington Secretary of State and Attorney General, from enforcing those provisions. Plaintiffs also seek relief for an alleged deprivation of their civil rights under 42 U.S.C. §§ 1983 and 1988. The two State officers who are defendants, and the intervenor defendants (Sherry Bockwinkel, LIMIT, U.S. Term Limits, Alan M. Gottlieb, Lee Gill, Wilbur B. McPherson, and Citizens for Term Limits), seek judgment upholding the constitutionality of Initiative 573 and denying any relief to plaintiffs. A variety of amici curiae have filed briefs.[1]

This court has jurisdiction under 28 U.S.C. § 1331. All parties have moved for summary judgment and/or for dismissal. The motions for dismissal are treated as summary judgment motions because matters outside the pleadings have been presented. Fed. R.Civ.P. 12(b)(6). There is no genuine issue of material fact for trial, and the case may be resolved on the motions under Fed.R.Civ.P. 56.

The briefs of all parties and friends of the court have been fully considered, as have the arguments of counsel given in open court at a hearing held on January 11, 1994.

## II. ELEVENTH AMENDMENT

■ These actions are brought against the Washington Secretary of State and Attorney General, who are responsible for implementing and enforcing Initiative 573. Although the Eleventh Amendment prohibits suits in federal court against a state without the state's consent, *see Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), it does not bar actions to enjoin state officials from enforcing an unconstitutional law. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *San Francisco County*

*Democratic Central Comm. v. Eu,* 826 F.2d 814, 824–25 (9th Cir.1987), *aff'd,* 489 U.S. 214, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989).[2]

## III. STANDING AND RIPENESS

The plaintiffs, supported by intervenor defendants Sherry Bockwinkel and LIMIT, and by some of the amici curiae, contend that plaintiffs have standing to sue and that the constitutional challenge is ripe for decision. The State defendants, supported by intervenor defendant U.S. Term Limits and by some of the amici curiae, contend that standing is absent and the case is not justiciable, i.e., is not ripe for decision.

### A. Standing

■ There are eight plaintiffs. In the *Colony* case, Thomas Foley, who has represented the Fifth Congressional District of Washington in Congress since 1965, declares that he plans to continue serving if the voters re-elect him. Initiative 573, if valid, will bar him from the ballot in 1998. Margaret Colony, a registered voter in the State's Eighth Congressional District, claims injury to her right to vote for constitutionally qualified candidates of her choice. The League of Women Voters of Washington, a civic organization, asserts representational standing for its member-voters. George Cheek is a registered voter in the Fifth District who intends to vote for Congressman Foley. John Clute, dean of the Gonzaga University School of Law, is also a registered voter in the Fifth District. In the *Thorsted* case, plaintiffs Susan Thorsted, William First, and Timothy S. Zenk are registered voters in Washington.

The plaintiffs allege injury to their rights as voters and/or as candidates, and to their rights of free association and political expression. Some assert standing based upon harm to public projects that are being sup-

---

**1.** Amici curiae contending that Initiative 573 is unconstitutional are Rep. Henry J. Hyde (R–Ill.) and the American Civil Liberties Union of Washington Foundation. Arguing in favor of constitutionality are the Washington Legal Foundation; Taxpayers United for Term Limits; Citizens United Foundation; Ronald D. Rotunda; and Wallace M. Rudolph.

**2.** By a separate order entered today, an unopposed motion in the *Thorsted* case to dismiss that action as against the State of Washington, defendants Munro and Gregoire in their personal capacities, and the spouses of the two State officials named as defendants, is granted. The *Colony* plaintiffs have named only the Washington Secretary of State and Attorney General as defendants.

ported by certain incumbents. The latter category need not be analyzed because plaintiff Foley's standing as a member of Congress who plans to seek re-election, and the other plaintiffs' standing as registered voters, are enough.

The Supreme Court has listed three elements of standing to sue: the plaintiff must have suffered an "injury in fact" (an invasion of a legally-protected interest which is "concrete and particularized" and is "actual or imminent"); there must be a "causal connection" between the injury and the conduct complained of; and it must be "likely," and not merely "speculative," that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, — U.S. —, —, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

The Court in *Lujan* held that if "the plaintiff is himself an object of the [government] action ... at issue ... there is ordinarily little question that the action ... has caused him injury." *Id.* — U.S. at —, 112 S.Ct. at 2137. Congressman Foley is clearly an "object" of Initiative 573; the measure, if enforced, will bar him from the ballot in the future. Like the plaintiffs in *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308–09, 60 L.Ed.2d 895 (1979), he has demonstrated a "realistic danger of sustaining a direct injury as a result of the [challenged] statute's operation or enforcement."

■ If one plaintiff has standing, it does not matter whether the others do. *Bowsher v. Synar*, 478 U.S. 714, 721, 106 S.Ct. 3181, 3185, 92 L.Ed.2d 583 (1986); *Watt v. Energy Action Educ. Found.*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 563 n. 9, 50 L.Ed.2d 450 (1977).

In this case, however, the voter plaintiffs have standing as well.

The Supreme Court has held that Article I, Section 2 of the Constitution "gives persons qualified to vote a constitutional right to vote and to have their votes counted." *Wesberry v. Sanders*, 376 U.S. 1, 17, 84 S.Ct. 526, 534, 11 L.Ed.2d 481 (1964). "No right," said the Court,

is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.

*Id.*, 376 U.S. at 17–18, 84 S.Ct. at 534–36.

■ It is true, as defendants point out, that a voter "does not have a fundamental right to vote for any particular candidate." *Burdick v. Takushi*, 927 F.2d 469, 473 (9th Cir.1991), *aff'd*, — U.S. —, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). But each voter does have a right to choose among candidates placed on the ballot without unconstitutional exclusions or restrictions.

The rights of voters and those of candidates are related and "do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical, correlative effect on voters." *Anderson v. Celebrezze*, 460 U.S. 780, 786, 103 S.Ct. 1564, 1568, 75 L.Ed.2d 547 (1983), *quoting Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972). In *Anderson* and *Bullock*, the Court allowed suits by voter plaintiffs or intervenors challenging state ballot access requirements.

The Ninth Circuit, interpreting *Anderson*, has upheld voter standing to challenge a candidate eligibility requirement since "basic constitutional rights of voters as well as those of candidates" are implicated. *Erum v. Cayetano*, 881 F.2d 689, 691 (9th Cir.1989), *citing Baker v. Carr*, 369 U.S. 186, 206, 82 S.Ct. 691, 704, 7 L.Ed.2d 663 (1962). The Circuit has also upheld a voter's standing to challenge a state election law write-in provision. *Burdick*, 927 F.2d at 472.

Initiative 573 would prevent the plaintiffs from casting their votes for any candidate barred from the ballot under its provisions except through a burdensome write-in procedure. The Supreme Court has held that a write-in opportunity "is not an adequate substitute for having the candidate's name appear on the printed ballot." *Anderson*, 460 U.S. at 799 n. 26, 103 S.Ct. at 1575 n. 26,

*citing Lubin v. Panish,* 415 U.S. 709, 719 n. 5, 94 S.Ct. 1315, 1321 n. 5, 39 L.Ed.2d 702 (1974). This threatened injury is enough to confer standing; the plaintiffs are not required to wait until the injury has actually occurred. *Babbitt,* 442 U.S. at 298, 99 S.Ct. at 2308–09; *Idaho Conservation League v. Mumma,* 956 F.2d 1508, 1515 (9th Cir.1992).

■ The League of Women Voters of Washington has representational standing to sue for its voter-members. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975); *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 2441–42, 53 L.Ed.2d 383 (1977).

**B. Ripeness**

■ Under the doctrine of ripeness, federal courts refrain from deciding "abstract disagreements" that might never become real disputes. *See Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580–81, 105 S.Ct. 3325, 3332–33, 87 L.Ed.2d 409 (1985). Ripeness is largely a question of timing, *id.,* 473 U.S. at 580, 105 S.Ct. at 3332, and the court must look to "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977).

Fitness for judicial decision may be found where the plaintiffs have standing and the issue "is a purely legal one," as with construction of a statute. *Id. See also Union Carbide,* 473 U.S. at 581, 105 S.Ct. at 3333; *Trustees for Alaska v. Hodel,* 806 F.2d 1378, 1381 (9th Cir.1986); *Helm v. California,* 722 F.2d 507 (9th Cir.1983); *Friedman Bros. Inv. Co. v. Lewis,* 676 F.2d 1317, 1319 (9th Cir.1982).

■ The questions raised here are purely legal: whether a state may add qualifications for election to Congress beyond those listed in Article I, Sections 2 and 3; if not, whether Initiative 573 imposes further qualifications; and whether plaintiffs' rights under the First and Fourteenth Amendments are violated.

The record is complete. The constitutional issues will not disappear, and to postpone deciding them would accomplish nothing. *See Union Carbide,* 473 U.S. at 581, 105 S.Ct. at 2634; *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 81, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978); *cf. Renne v. Geary,* 501 U.S. 312, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991) (further opportunity for the state courts to interpret the statute might alter the question presented).

As for hardship to the parties, the plaintiffs and intervenor defendants Bockwinkel and LIMIT have shown that they would be substantially harmed by delay. In the face of uncertainty about whether Initiative 573 will stand, plaintiff Foley is unable to plan whether to run again beyond the 1996 election. Even if he decides to run, until this matter is resolved he cannot know *how* to run—whether to wait until 1998 to campaign in the customary way, or to embark sooner on a long-range effort to overcome the ballot-exclusion barrier. The voter plaintiffs are deprived of information they need in deciding which candidates to support, when to begin supporting them, and by what methods. LIMIT, self-described as a temporary organization, is forced to try to prolong its existence and solvency for as long as necessary to defend its position. Ms. Bockwinkel is an organizer and leader of LIMIT. As an official sponsor of the initiative, LIMIT has a judicially-recognized interest in seeking to have it upheld. *See* RCW 29.79.010 and *Yniquez v. Arizona,* 939 F.2d 727, 733 (9th Cir. 1991).

The Supreme Court has described the importance of deciding a challenge to the constitutionality of an election law before it takes effect:

> Though waiting until [plaintiffs] invoke unsuccessfully the statutory election procedures would remove any doubt about the existence of concrete injury resulting from application of the election provision, little could be done to remedy the injury incurred in the particular election. Challengers to election procedures often have been left without a remedy in regard to the most immediate election because the

election is too far underway or already consummated prior to judgment.... Justiciability in such cases depends not so much on the fact of past injury but on the prospect of its occurrence in an impending or future election.

*Babbitt,* 442 U.S. at 300 n. 12, 99 S.Ct. at 2310 n. 12. *See also Buckley v. Illinois Judicial Inquiry Bd.,* 997 F.2d 224, 226 (7th Cir.1993); *Signorelli v. Evans,* 637 F.2d 853, 858 (2nd Cir.1980).

To put off a court test of Initiative 573 until 1997 or 1998 would not only inflict uncertainty on the parties and the public, but would risk a failure to complete review by the Ninth Circuit, and perhaps by the Supreme Court, before the ostensible winners of the 1998 election are sworn into office. *See Joyner v. Mofford,* 706 F.2d 1523, 1527 (9th Cir.), *cert. denied,* 464 U.S. 1002, 104 S.Ct. 509, 78 L.Ed.2d 698 (1983).

The case is ripe for adjudication, and the constitutional issues must be decided.

## IV. CONSTITUTIONALITY

### A. State Legislation and the Constitution

The parties have expressed fervent beliefs for and against term limits for members of Congress. The proponents say that long-term incumbents become indifferent to the well-being of the people, preoccupied with re-election, aligned with special interest groups, hard to dislodge because they hold a great advantage in fund-raising, and resistant to any change that would level the playing field. The opponents say that there is in fact a large and steady turnover in congressional membership, voters should be free to re-elect good representatives, the way to end a political career is simply to defeat the incumbent at the polls, and term limits would weaken the national legislature. These arguments are important in a policy debate but cannot determine the legal issues. Whether congressional term limits are wise or foolish is not for the courts to decide. The nation could adopt them by amending the Constitution, as it did in limiting the President to two elected terms in the Twenty–Second Amendment, ratified in 1951. The question is whether a state may adopt them in the absence of a federal constitutional amendment.

A state statute that violates the United States Constitution must be held invalid. *Fletcher v. Peck,* 10 U.S. (6 Cranch) 87, 3 L.Ed. 162 (1810).

In Washington the initiative process is a way "to propose bills, laws, and to enact or reject the same at the polls, independent of the legislature...." Wash. Const., art. II, § 1. An initiative is tested by the same constitutional standards as a bill adopted by the legislature. As the Supreme Court held in *Citizens Against Rent Control v. City of Berkeley,* 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981):

It is irrelevant that the voters rather than a legislative body enacted [the statute], because the voters may no more violate the Constitution by enacting a ballot measure than a legislative body may do so by enacting legislation.

*Id.,* 454 U.S. at 295, 102 S.Ct. at 437.[3]

### B. The Qualifications Clauses

█ The first challenge to Initiative 573 is brought under the Qualifications Clauses. Article I, Section 2 of the Constitution provides in part:

No Person shall be a Representative who shall not have attained to the Age of twenty five Years, and been seven Years a Citizen of the United States, and who shall

---

3. Several Washington initiatives have been declared unconstitutional by federal courts. *See Continental Ill. Nat'l Bank v. State of Washington,* 696 F.2d 692 (9th Cir.1983) (Initiative 394 regulating WPPSS financing held unconstitutional under Contract Clause); *Washington State Building & Construction Trades Council v. Spellman,* 518 F.Supp. 928 (E.D.Wash.1981), *aff'd,* 684 F.2d 627 (9th Cir.1982) (Initiative 383 prohibiting shipment of nuclear waste to Washington held unconstitutional under Supremacy and Commerce Clauses); *Seattle School Dist. No. 1 v. State of Washington,* 473 F.Supp. 996 (W.D.Wash.1979), *aff'd in part, rev'd in part,* 633 F.2d 1338 (9th Cir.1980), *aff'd,* 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982) (Initiative 350 limiting school busing held unconstitutional under Equal Protection Clause); *Spokane Arcades, Inc. v. Ray,* 449 F.Supp. 1145, 1158 (E.D.Wash. 1978) (Initiative 335 dealing with obscenity held unconstitutional under First Amendment).

not, when elected, be an Inhabitant of that State in which he shall be chosen.

Article I, Section 3 provides in part:

No Person shall be a Senator who shall not have attained to the Age of thirty Years, and been nine Years a Citizen of the United States, and who shall not, when elected, be an Inhabitant of that State for which he shall be chosen.

The defendants contend that these provisions list only the minimum qualifications for the House and Senate, and that a state may add to them.

### 1. The *Powell* Case

The Supreme Court in *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), held that the Article I qualifications for election—age, citizenship, and residency—cannot be added to by Congress.

*Powell* arose from an attempt by the House of Representatives to exclude a re-elected member from New York, found by a majority of his colleagues to have engaged in financial misconduct. The member sued, claiming that since he possessed the qualifications listed in Article I, Section 2, the House had no authority to deny him his seat. The Court agreed, holding that Congress is "without authority to *exclude* any person, duly elected by his constituents, who meets all the requirements for membership expressly prescribed in the Constitution." *Id.*, 395 U.S. at 522, 89 S.Ct. at 1964 (emphasis in original).

Although Section 2 is phrased in the negative—"No Person shall...."—the Court found it equivalent to a positive list of qualifications. *Id.*, 395 U.S. at 537–39, 89 S.Ct. at 1972–73.

The narrow holding of *Powell* defined Congress's power under Article I, Section 5, which provides that "[e]ach House shall be the Judge of the Elections, Returns, and Qualifications of its own members...." But in reaching its result the Court marshaled the historical and legal precedents showing that neither Congress nor the states can add to the Article I, Sections 2 and 3, qualifications. It referred to "the Framers' under-

standing that the qualifications for members of Congress had been fixed in the Constitution." *Id.*, 395 U.S. at 540, 89 S.Ct. at 1973. It quoted, among other sources, Alexander Hamilton's reply to an antifederalist charge that the new Constitution would favor the wealthy:

"The qualifications of the persons who may choose or be chosen, as has been remarked upon other occasions, are defined and fixed in the Constitution, and are unalterable by the legislature."

*Id.*, 395 U.S. at 539, 89 S.Ct. at 1973, *quoting* The Federalist Papers 371 (Mentor ed. 1961) (emphasis omitted).

The Court quoted, as well, James Madison's statement that, " '[t]he qualifications of the elected ... have been very properly considered and regulated by the [constitutional] convention.' " *Id.*, 395 U.S. at 540 n. 74, 89 S.Ct. at 1973, *quoting* The Federalist Papers 326 (Mentor ed. 1961).

And the Court quoted an 1807 report by the House Committee of Elections recommending that a member be seated despite his failure to meet additional state-imposed residency requirements:

."The committee proceeded to examine the Constitution, with relation to the case submitted to them, and find that qualifications of members are therein determined, without reserving any authority to the State Legislatures to change, add to, or diminish those qualifications; ...."

*Id.*, 395 U.S. at 542, 89 S.Ct. at 1975, *quoting* 17 Annals of Cong. 871 (1807).

The *Powell* Court concluded that "in judging the qualifications of its members Congress is limited to the standing qualifications prescribed in the Constitution." *Id.*, 395 U.S. at 550, 89 S.Ct. at 1979.

### 2. Pre– and Post–*Powell* Decisions Under the Qualifications Clauses

For many years, before and after *Powell*, courts have held that the states, like Congress, are without power to add substantive requirements for election to Congress to those set forth in the Qualifications Clauses. In *Joyner v. Mofford*, 706 F.2d at 1528, the Ninth Circuit stated:

From the beginning of the Republic, commentators have asserted that the three qualifications contained in the Clause—age, citizenship, and residency—are exclusive, and that neither Congress nor the states may require more of a candidate. *See, e.g.,* 1 J. Story, Commentaries on the Constitution 453–63 (5th ed. 1891). In *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the Supreme Court accepted this restrictive view of the Qualifications Clause—at least as applied to Congress—and held that members of Congress may not set extra-constitutional qualifications for taking a seat in the House of Representatives. In addition, as the district court observed in the present case, the same principle has frequently been applied to state laws imposing additional qualifications on candidates for federal office. [Joyner v. Mofford] 539 F.Supp. [1120] at 1121–22 & n. 1 [ (D.C.Ariz.1982) ].

*See also Public Citizen, Inc. v. Miller,* 813 F.Supp. 821, 831 (N.D.Ga.) ("Although *Powell* did not address *states'* power to add qualifications for membership in the House of Representatives, courts agree that states are similarly denied the power to act in this area") (emphasis in original), *aff'd mem.,* 992 F.2d 1548 (11th Cir.1993); *United States v. Richmond,* 550 F.Supp. 605, 607 (E.D.N.Y. 1982) ("the states are barred from imposing additional qualifications on congressional candidates"); *Dillon v. Fiorina,* 340 F.Supp. 729, 731 (D.N.M.1972) ("That a state cannot add to or take away from these [Article I] qualifications is well settled," invalidating two-year district residency requirement); *Exon v. Tiemann,* 279 F.Supp. 609, 613 (D.Neb.1968) ("There being no such requirement in the Constitution itself, a state cannot require that a Representative live in the District from which he was nominated").

Among the many state court decisions reaching the same conclusion are *State ex rel. Chandler v. Howell,* 104 Wash. 99, 175 P.

569, 570 (1918) ("So long as a candidate for membership in Congress meets the requirements set forth in the constitution which created the office, no state has the right or authority to prevent his candidacy, either by provisions in its constitution or in its statutes"); *Application of Ferguson,* 57 Misc.2d 1041, 294 N.Y.S.2d 174 (N.Y.Sup.Ct.), *aff'd,* 30 A.D.2d 982, 294 N.Y.S.2d 989 (1968) (disqualification of candidate convicted of a felony held invalid); *Shub v. Simpson,* 196 Md. 177, 76 A.2d 332 (anti-subversion declaration requirement held unconstitutional), *appeal dismissed,* 340 U.S. 881, 71 S.Ct. 198, 95 L.Ed. 640 (1950); *Strong v. Breaux,* 612 So.2d 111, 112 (La.App.1992) ("The qualifications prescribed by [Article I, Section 3] are exclusive and neither a state constitution nor state law can add to nor take away from such qualifications").[4]

### 3. The Constitutional Freedom to Choose Governmental Representatives

The cases holding that neither the states nor Congress may add to the Article I qualifications for service in Congress all rest on the same foundation: the constitutional right of voters in the United States to elect legislators of their choice. The *Powell* Court said:

A fundamental principle of our representative democracy is, in Hamilton's words, "that the people should choose whom they please to govern them." 2 Elliot's Debates 257. As Madison pointed out at the Convention, this principle is undermined as much by limiting whom the people can select as by limiting the franchise itself.

395 U.S. at 547, 89 S.Ct. at 1977.

The Court in *Powell* repeatedly mentioned this basic freedom:

"That the right of the electors to be represented by men of their own choice, was so essential for the preservation of all their other rights, that it ought to be con-

---

4. The Washington legislature appears to have recognized that the state cannot add qualifications for Congress to those set forth in Article I. RCW 29.15.025 requires that "[t]he name of a candidate for an office shall not appear on a ballot for that office unless the candidate is ... properly registered to vote in the geographic area represented by the office," but adds: "This section does not apply to the office of a member of the United States Congress." Thus, while the declaration of candidacy form includes a "place for the candidate to declare that he or she is a registered voter within the jurisdiction of the office for which he or she is filing," RCW 29.15.-010(1), such a declaration need not be made by a candidate for Congress.

sidered as one of the most sacred parts of our [English] constitution."

395 U.S. at 534 n. 65, 89 S.Ct. at 1970 n. 65, *quoting* 16 Parl.Hist.Eng. 589–90 (1769).

"Under these reasonable limitations [of Article I], the door of this part of the federal government is open to merit of every description, whether native or adoptive, whether young or old, and without regard to poverty or wealth, or to any particular profession or religious faith."

*Id.*, 395 U.S. at 540 n. 74, 89 S.Ct. at 1526 n. 74, *quoting* Madison, The Federalist Papers 326 (Mentor ed. 1961).

"[T]he true principle of a republic is, that the people should choose whom they please to govern them. Representation is imperfect in proportion as the current of popular favor is checked. This great source of free government, popular election, should be perfectly pure, and the most unbounded liberty allowed."

*Id.*, 395 U.S. at 540–41, 89 S.Ct. at 1973–75, *quoting* Hamilton, 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876) (hereinafter cited as "Elliot's Debates").

"It has ever been considered a great security to liberty, that very few should be excluded from the right of being chosen to the legislature. This Constitution has amply attended to this idea. We find no qualifications required except those of age and residence, which create a certainty of their judgment being matured, and of being attached to their state."

*Id.*, 395 U.S. at 541, 89 S.Ct. at 1974, *quoting* Wilson Carey Nicholas, 3 Elliot's Debates 8.

■ As *Powell, Joyner,* and the other authorities cited above make clear, the voters' freedom to choose federal legislators must not be abridged by laws that make qualified persons ineligible to serve.

### 4. Term Limit Laws and Freedom of Choice

If adopted as a complete bar to re-election, a term limits law would exclude a category of candidates qualified under Article I: those who have served for a certain time. It would allow a bare majority of those voting in a current year to prevent, say, eighty percent in a later year from electing a candidate of their choice.[5]

Term limits for members of Congress, like the property-ownership qualification which many urged at the time, were considered by the Framers of the Constitution. A number of states had imposed term limits on members of their legislatures. Under the Articles of Confederation, delegates to Congress could not serve "for more than three years in any term of six years; . . . ." Art. Conf. V (1777). The phrase "rotation in office" was current then as it is now. By 1787 these efforts were widely seen as a failed experiment.[6] On June 12, 1787, the Constitutional Convention voted unanimously to reject congressional term limits. *See* 1 Max Farrand, *The Records of the Federal Convention of 1787* (1937) 217; *Supplement to Max Farrand's The Records of the Federal Convention of 1787* (James H. Hutson ed., 1987) 71.

In adopting a short but comprehensive list of qualifications for Congress—age, citizenship, and residency—the Framers protected the "indisputable right [of the people] to return whom they thought proper" to the legislature. *Powell*, 395 U.S. at 535, 89 S.Ct. at 1971, *quoting* 16 Parl.Hist.Eng. 589.

■ In a political climate different from today's, a state's voters—or its legislature—might believe that age brings wisdom, government experience brings knowledge, and long-term incumbency brings power in the nation's capital. The state might therefore adopt an experience requirement: only those presently serving in Congress, or with at least two years of service in Congress or in the state legislature, would be eligible for

---

**5.** These figures are not entirely hypothetical. The late Henry M. Jackson of Washington, who served twelve years in the House and thirty in the Senate before dying in office in 1983, won re-election with an eighty-two percent statewide majority in 1970, and often won more than two-

thirds of the vote. *See* Official Abstract of Votes, State of Washington.

**6.** *See* Gordon S. Wood, *The Creation of the American Republic, 1776–1787* (1969) at 140–41, 398–99, 436–38, 477.

election to the federal House or Senate. This method of "going through the chairs" could be presented as thoroughly democratic, since anyone could run for the state legislature. But to bar those without legislative experience from serving in Congress would be plainly unconstitutional under Article I, Sections 2 and 3. And just as experience in government cannot be added as a qualification, neither can inexperience. A state may not diminish its voters' constitutional freedom of choice by making would-be candidates for Congress ineligible on the basis of incumbency or history of congressional service.[7]

### 5. Initiative 573 and the Qualifications Clauses

 While the Constitution bars the states from imposing substantive restrictions on *who* may be elected to Congress, it permits reasonable state regulation of *how* elections are conducted. Article I, Section 4, provides in part:

The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations....

It is argued that Initiative 573 is not a term limits law but a ballot access measure, and as such is constitutional under Section 4. The Initiative does not impose a total ban on re-election. While barring the targeted incumbents from the ballot in order to cause their defeat (or their decision not to run), it leaves open a pinhole of opportunity: a barred incumbent may run a write-in campaign.

The Washington election code provides that a candidate who desires to have his or her name printed on the ballot for Congress must file a declaration of candidacy. RCW 29.15.010. One who seeks to be a write-in

candidate may file a declaration of candidacy not later than the day before the election. RCW 29.04.180. If such a declaration has been filed, voters may write in the candidate's name at the appropriate place on the ballot; absent a filed declaration, one voting for a candidate not on the ballot "must designate the office sought and position number or political party, if applicable." *Id.* Whether a vote will be counted turns on the Canvassing Board's ability to discern the voter's intent. RCW 29.51.170. Initiative 573 makes incumbents with the specified length of service "ineligible to appear on the ballot or file a declaration of candidacy." Appendix A, Sections 4, 5, and 7.

The measure will thus keep barred incumbents off the ballot no matter what they do.

If this restriction is a state-imposed qualification for congressional office, it must be held invalid under Article I, Sections 2 and 3. If it does not impose a new qualification, then its constitutionality as a ballot access measure is tested by different standards.

The Supreme Court has recognized that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974). It has, accordingly, "upheld generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." *Anderson v. Celebrezze,* 460 U.S. 780, 788 n. 9, 103 S.Ct. 1564, 1569 n. 9, 75 L.Ed.2d 547 (1982).

Among the cases upholding state ballot access laws on this basis are *Storer,* 415 U.S. at 733, 94 S.Ct. at 1280 (law denying ballot position to independent candidates who had a registered affiliation with a political party within one year prior held "expressive of a

7. *See,* for a variety of views, the law review articles listed in Appendix B to this order. *See also Stumpf v. Lau,* 108 Nev. 826, 839 P.2d 120, 123 (1992) ("The [Nevada] term limits initiative clearly and 'palpably' violates the qualifications clauses of Article I of the United States Constitution"). Such holdings under Article I, Sections 2 and 3, of course, relate to the *federal* legislature. Term limits applicable to *state* offices are tested

not under Article I but under state constitutional law and under the First and Fourteenth Amendments to the United States Constitution. *See, e.g., Miyazawa v. City of Cincinnati,* 825 F.Supp. 816 (S.D.Ohio 1993); *Legislature v. Eu,* 54 Cal.3d .492, 286 Cal.Rptr. 283, 816 P.2d 1309 (1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1292, 117 L.Ed.2d 516 (1992).

general state policy aimed at maintaining the integrity of the various routes to the ballot" and to involve "no discrimination against independents"; *American Party v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) (petition requirement for independents and minor parties); *Hopfmann v. Connolly*, 746 F.2d 97 (1st Cir.1984), *vacated in part on other grounds*, 471 U.S. 459, 105 S.Ct. 2106, 85 L.Ed.2d 469 (1985) (party requirement that candidates receive fifteen percent of the vote at the convention in order to be included on the ballot in the state primary election); *Public Citizen, Inc. v. Miller*, 813 F.Supp. 821 (N.D.Ga.) (law requiring a run-off election for Congress), *aff'd per curiam*, 992 F.2d 1548 (11th Cir.1993); *Williams v. Tucker*, 382 F.Supp. 381 (M.D.Pa.1974) (statute preventing candidate from contemporaneously filing nomination papers and running in primary); *Clark v. Rose*, 379 F.Supp. 73 (S.D.N.Y.1974) (statute requiring authorization of party's state committee for non-member of party to run in its primary), *aff'd*, 531 F.2d 56 (2nd Cir.1976); *Fowler v. Adams*, 315 F.Supp. 592 (M.D.Fla.1970) (statute requiring candidates to pay a filing fee), *appeal dismissed*, 400 U.S. 986, 91 S.Ct. 477, 27 L.Ed.2d 436 (1971).

But the law recognizes that fundamental rights under the First and Fourteenth Amendments are affected by ballot access measures. In *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968), the Supreme Court struck down a state statute that imposed onerous petition requirements on small parties seeking ballot access, and stated:

> In the present situation the state laws place burdens on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.

It "is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama*, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). A law that excludes candidates from the ballot "burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying point for like-minded citizens." *Anderson*, 460 U.S. at 787–88, 103 S.Ct. at 1569–70. As for candidates' rights, although reasonable regulations may be imposed, "[t]he right of a party or an individual to a place on a ballot is entitled to protection and is intertwined with the rights of voters." *Lubin*, 415 U.S. at 716, 94 S.Ct. at 1320.

The inquiry is "whether the challenged restriction unfairly or unnecessarily burdens the 'availability of political opportunity.'" *Anderson*, 460 U.S. at 793, 103 S.Ct. at 1572, quoting *Clements v. Fashing*, 457 U.S. 957, 964, 102 S.Ct. 2836, 2844, 73 L.Ed.2d 508 (1982), and *Lubin*, 415 U.S. at 716, 94 S.Ct. at 1320. On this basis, unduly restrictive ballot measures have been held unconstitutional as violating the First and Fourteenth Amendment rights of voters and candidates. *See, e.g., Anderson, supra* (early filing requirement for independent candidates for President, without comparable requirement for party candidates); *Norman v. Reed*, —— U.S. ——, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992) (requirement that more signatures be obtained to appear on local ballot than were required to appear on statewide ballot); *Tashjian v. Republic Party*, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (requirement that party hold primary open only to its members); *Lubin, supra* (excessive filing fees).

The state election laws that have been upheld have been general ground rules designed to make elections "fair and honest" and to impose "some sort of order, rather than chaos" on the electoral process, *see Burdick v. Takushi*, —— U.S. ——, ——, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992), or to prevent "voter confusion, ballot overcrowding, or the presence of frivolous candidacies," *Munro v. Socialist Workers Party*, 479 U.S. 189, 194–95, 107 S.Ct. 533, 537–38, 93 L.Ed.2d 499 (1986).

All such laws have been open to compliance by candidates who take the necessary steps, or make the required showing, in the election process itself.

Initiative 573, in contrast, is aimed not at achieving order and fairness in the process but at preventing a disfavored group of candidates from being elected at all. The Initiative plainly states its purpose: to get rid of "entrenched incumbents." It aims to prevent "the self-perpetuating monopoly of elective office by a dynastic ruling class." Appendix A, section 1(7). It refers to ballot-barred persons as "ineligible for the office." *Id.*, section 7(2). The statement for it in the "1992 Voters Pamphlet" published by the Secretary of State repeatedly describes it as a "term limits" measure. *See* Exhibit B to State Defendants' Memorandum in Support of Summary Judgment. It is codified at several places in RCW Ch. 29 under the heading "Initiative Measure 573—Term Limits."

Denial of ballot access ordinarily means unelectability. The State concedes that no one in its history has been elected to Congress by a write-in vote. The record shows that in the country as a whole only three candidates for the House have been elected by write-in votes since 1958, and only one candidate for the Senate has been elected by that method since 1954.

The Initiative would thus have the practical effect of imposing a new qualification: non-incumbency beyond the specified periods. The intended and probable result would be the same as if the State were to adopt non-incumbency as an absolute requirement. A state may not do indirectly what the Constitution forbids it to do directly. *Frost & Frost Trucking Co. v. Railroad Comm'n of California*, 271 U.S. 583, 593–94, 46 S.Ct. 605, 607, 70 L.Ed. 1101 (1926). The challenged parts of Initiative 573 must therefore be held to impose additional qualifications for Congress in violation of Article I, Sections 2 and 3.

### 6. The Resign-to-Run Cases

The resign-to-run cases, cited by both sides, do not suggest that Initiative 573 is constitutional. Those cases arise from laws that require public officials to resign from a state post before running for an elected federal position, or that treat a declaration of candidacy for Congress as an automatic resignation from state office. Some courts have held such provisions unconstitutional as imposing additional qualifications. *See State ex rel. Chandler v. Howell*, 104 Wash. 99, 175 P. 569, 570 (1918); *State ex rel. Wettengel v. Zimmerman*, 249 Wis. 237, 24 N.W.2d 504 (1946); *Stack v. Adams*, 315 F.Supp. 1295 (N.D.Fla.1970). Others have upheld them as valid exercises of a state's power to regulate the conduct of its own officeholders. *See Signorelli v. Evans*, 637 F.2d 853 (2nd Cir. 1980); *Adams v. Supreme Court of Pa.*, 502 F.Supp. 1282 (M.D.Pa.1980); *Oklahoma State Election Board v. Coats*, 610 P.2d 776 (Okla.1980); *Alex v. County of Los Angeles*, 35 Cal.App.3d 994, 111 Cal.Rptr. 285 (1973). The Ninth Circuit, reviewing an Arizona constitutional provision that required certain officials to resign as a condition of running for Congress in the final year of their state terms, explained these holdings as follows:

> The courts considering challenges to state laws relying on the Qualifications Clause have distinguished between state provisions which bar a potential candidate from running for federal office, and those which merely regulate the conduct of state officeholders. The former category of laws imposes additional qualifications on candidates and therefore violates the Qualifications Clause, while the latter category is constitutionally acceptable since it merely bars state officeholders from remaining in their positions should they choose to run for federal office.

*Joyner v. Mofford*, 706 F.2d at 1528.

Finding that the Arizona provision "regulates the conduct of state officials" and "merely requires that they not occupy a state office while seeking either a federal or state elective office," the court upheld it as constitutional. *Id.* at 1531, 1533.

The resign-to-run cases turn on a state's power to regulate its own officials' conduct. That factor is not present here. There is no constitutional basis for a state to require non-service, or limited prior service, in Con-

gress as a condition of election to the House or Senate.

## C. Alternative Ruling Under Article I, Section 4

■■■ Even if viewed as an attempt to regulate the electoral process, the federal-office sections of the Initiative would have to be held invalid. Measures lawfully adopted under Article I, Section 4, are designed to "protect the integrity and reliability of the electoral process." *Anderson,* 460 U.S. at 788 n. 9, 103 S.Ct. at 1569 n. 9. Ballot-access restrictions "implicate[ ] basic constitutional rights." *Id.,* 460 U.S. at 786, 103 S.Ct. at 1568. The court must weigh the "character and magnitude of the asserted injury to the right protected by the First and Fourteenth Amendments" and "the precise interests put forward by the State as justifications for the burdens imposed by its rule." *Id.,* 460 U.S. at 789, 103 S.Ct. at 1570. Any "severe restrictions" designed to assure an honest and orderly electoral process must be "narrowly drawn to advance a state interest of compelling importance," *Norman v. Reed,* — U.S. —, —, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992), and must be "reasonable [and] non-discriminatory," *Burdick,* — U.S. at — – —, 112 S.Ct. at 2063–64. "[W]e have repeatedly upheld," said the *Burdick* Court, "reasonable, politically neutral regulations that have the effect of channeling expressive activity at the polls." — U.S. at —, 112 S.Ct. at 2066.

Sections 4 and 5 of Initiative 573 are neither neutral, nor nondiscriminatory, nor narrowly drawn. They seek to determine the outcome, not the procedures. The state interest claimed is to prevent congressional incumbents from winning; but the Constitution places that decision with the voters in each election, not with a state government.

The extent to which a state might try to even a congressional race through neutral measures (such as providing forums or financing for all candidates) is outside the scope of this case. Initiative 573 is not such a measure. Instead, it hobbles a few runners to make sure they lose. A state may not constitutionally do that, just as it may not bar qualified runners from the track.

## D. The Ninth and Tenth Amendments

It is argued that, notwithstanding Article I, Sections 2 and 3, the Ninth and Tenth Amendments reserve to the states the power to limit congressional terms. The Ninth Amendment provides:

> The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

The Tenth Amendment provides:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

■■■ These two amendments are "restrictions upon federal power, intended to prevent interference with the rights of the States and of their citizens." *Fox v. Ohio,* 46 U.S. (5 How.) 410, 434, 12 L.Ed. 213 (1847). Their very wording shows their inapplicability. The Ninth Amendment assures rights to the people beyond those specifically listed but implies no right to alter the governmental structure established by the Constitution. The Tenth Amendment concerns powers "not delegated to the United States by the Constitution"; it implies no state power to abridge what *is* delegated to the United States.

Justice Story in his *Commentaries* spoke to whether the Tenth Amendment reserved any power to the states to add qualifications for Congress:

> [N]o powers could be reserved to the States, except those which existed in the States before the Constitution was adopted. The [tenth] amendment does not profess, and, indeed, did not intend to confer on the States any new powers, but merely to reserve to them what were not conceded to the government of the Union.... [W]here did the States get the power to appoint representatives in the national government? Was it a power, that existed at all before the Constitution was adopted? ...
>
> The truth is, that the States can exercise no powers whatsoever which exclusively spring out of the existence of the national government, which the Constitution does

not delegate to them. They have just as much right, and no more, to prescribe new qualifications for a representative, as they have for a President. Each is an officer of the Union, deriving his powers and qualifications from the Constitution.... It is no original prerogative of State power to appoint a representative, a senator, or President for the Union. Those officers owe their existence and functions to the united voice of the whole, not of a portion of the people.... No State can say that it has reserved what it never possessed.

2 J. Story, *Commentaries on the Constitution of the United States* §§ 626–27 (5th ed. 1891).

The case of *Gregory v. Ashcroft*, 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), relied upon by term limits proponents, concerned a state's power to set qualifications for state, not federal, office, and is not in point.

■ The Ninth and Tenth Amendments cannot be read to allow the states to limit their citizens' freedom of choice by adding qualifications for Congress, while Sections 2 and 3 of Article I preclude them from doing so.

## V. SECTION 1983 CLAIMS

■ The plaintiffs also seek declaratory and injunctive relief under a federal civil rights law, 42 U.S.C. § 1983, and an award of attorney fees under 42 U.S.C. § 1988. Since, for the reasons given above, declaratory and injunctive relief must be awarded on plaintiffs' constitutional claims—and would thus be ordered whether or not any civil rights claims were asserted—the only practical importance of the latter is the application for attorney fees.

Section 1983 provides:

Every person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Civil rights cases typically involve acts committed by state officials with resulting harm to the plaintiffs. The defendants Munro and Gregoire, the Washington Secretary of State and Attorney General, point out that they have done nothing yet to enforce Initiative 573. They argue that they have not subjected plaintiffs "to the deprivation of any rights," and that accordingly there is no liability under Section 1983.

■ The difficulty with this argument is that the Supreme Court has mandated that Section 1983 be " 'broadly construed, against all forms of official violation of federally protected rights.' " *Dennis v. Higgins*, 498 U.S. 439, 444, 111 S.Ct. 865, 869, 112 L.Ed.2d 969 (1991), *quoting Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 700–701, 98 S.Ct. 2018, 2040–41, 56 L.Ed.2d 611 (1978). Threatened harm that has not yet occurred, but that will occur unless judicial relief is afforded, is enough to support a civil rights claim. *See, e.g., Wright v. Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 431–32, 107 S.Ct. 766, 774–75, 93 L.Ed.2d 781 (1987). Injunctive and declaratory relief are proper under Section 1983, which authorizes, among other procedures, a "suit in equity." *See, e.g., Fraser v. Bethel School Dist.*, 755 F.2d 1356 (9th Cir.1985), *rev'd on other grounds*, 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986). The State defendants are prepared to enforce Initiative 573 if it is upheld, and have defended its constitutionality in this case. Since the threatened enforcement would deprive plaintiffs of constitutional rights, entitlement to injunctive and declaratory relief under Section 1983 has been shown. *See Mitchum v. Foster*, 407 U.S. 225, 242, 92 S.Ct. 2151, 2162, 32 L.Ed.2d 705 (1972); *see also Baer v. Meyer*, 728 F.2d 471, 474–76 (10th Cir.1984); *McCarthy v. Askew*, 420 F.Supp. 775, 777–79 (S.D.Fla.), *aff'd*, 540 F.2d 1254 (5th Cir.1976); *Sotomura v. County of Hawaii*, 402 F.Supp. 95, 102–103 (D.Haw.1975).

It does not follow, however, that attorney fees must automatically be awarded. Section 1988 provides that

the court, in its discretion, may allow the prevailing party [in a Section 1983 case],

other than the United States, a reasonable attorney's fee as part of the costs.

While a prevailing plaintiff "'should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust,'" *Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S.Ct. 1933, 1936, 76 L.Ed.2d 40 (1983), *quoting Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968), a degree of discretion remains. Section 1988 should not be applied "woodenly without consideration of the underlying factors which generated it." *Buxton v. Patel*, 595 F.2d 1182, 1184 (9th Cir.1979), *quoting Zarcone v. Perry*, 581 F.2d 1039, 1044 (2nd Cir.1978).

■■■ The special circumstances here would make an award of fees unjust. The record shows the following, which the court now finds as facts: [8]

1. No award is needed to serve the purpose of Section 1988, which is to assure "effective access to the judicial process." *Hensley*, 461 U.S. at 429, 103 S.Ct. at 1937. This is not a typical civil rights case. The mere filing of suit by anyone with standing would have assured a full court test. *See* the briefs amicus curiae, which demonstrate this.

2. No relief has been won under the Section 1983 claims beyond that already awarded under the constitutional claims.

3. The legislation that prompted the suit was adopted by a voters' initiative, not by State officials. The deterrence purpose of Section 1983, *see Wyatt v. Cole*, —— U.S. ——, ——, 112 S.Ct. 1827, 1830, 118 L.Ed.2d 504 (1992), is inapplicable.

4. The defendant officials have not yet enforced Initiative 573. Their willingness to do so if it is upheld reflects only the minimum their oaths of office require. *Cf. May v. Cooperman*, 578 F.Supp. 1308 (D.N.J.1984) (denying attorney fees as against state officials who took no action to enforce an unconstitutional statute, but granting them against state legislators who intervened).

5. The State officials have acted in good faith. "The Ninth Circuit has ruled that a defendant's good faith is one factor of several that a court may consider in applying the Attorney's Fees Act." *Teitelbaum v. Sorenson*, 648 F.2d 1248, 1250 (9th Cir.1981).

6. This is a case of first impression in federal court, and the public interest requires that it be adjudicated through a full adversary process. The State defendants have done nothing to increase the litigation costs beyond what would have been necessary in any event.

7. There was no way for the State officials to settle the case by agreement. Even if a stipulation of unconstitutionality had been entered (a most unlikely event), the court would have rejected it. State legislation is presumed constitutional until the contrary is shown. *Clements v. Fashing*, 457 U.S. at 963–64, 102 S.Ct. at 2843–44.

On the basis of the foregoing findings, the court now makes and enters the following conclusions of law:

1. Within the meaning of *Hensley, supra,* special circumstances exist in this case which would make an award of attorney fees "manifestly unfair." *See Cunningham v. County of Los Angeles*, 869 F.2d 427, 436–37 (9th Cir.1988); *Aho v. Clark*, 608 F.2d 365, 367 (9th Cir.1979).

2. Cases holding that particular mitigation factors are insufficient to avoid a fee award (e.g., *Teitelbaum, supra,* and *Wilson v. Stocker*, 819 F.2d 943, 951 (10th Cir.1987)), are distinguishable. None involved the totality of circumstances present here.

3. Accordingly, plaintiffs' applications for attorney fees under 42 U.S.C. § 1988 should be denied.

## VI. CONCLUSION

For the reasons stated, the motions for summary judgment are granted and denied as follows: The plaintiffs have standing to

---

8. The Ninth Circuit requires findings of fact and conclusions of law if fees are denied under Section 1988. *Sethy v. Alameda County Water District*, 602 F.2d 894, 897 (9th Cir.1979). The facts found here are clearly shown in the record and no further hearing is required. The burden of showing special circumstances, *see Herrington v. County of Sonoma*, 883 F.2d 739, 744 (9th Cir. 1989), has been sustained.

sue and these cases are ripe for decision. Plaintiffs are entitled to judgment declaring that sections 4 and 5 of Washington Initiative Measure 573, denying ballot access to certain candidates for the United States Senate and House of Representatives, are invalid under Article I, Sections 2 and 3, of the United States Constitution, and under the First and Fourteenth Amendments, and enjoining the State defendants from implementing or enforcing those sections and section 7 insofar as it incorporates them. Plaintiffs are entitled to the same relief under the provisions of 42 U.S.C. § 1983. Because special circumstances exist that would make an award unjust, plaintiffs' applications for attorney fees under 42 U.S.C. § 1988 are denied. Judgment will be entered accordingly.

## APPENDIX A

### COMPLETE TEXT OF INITIATIVE MEASURE 573

AN ACT Relating to ballot access for elected officials; adding a new section to chapter 43.01 RCW; adding a new section to chapter 44.04 RCW; adding new sections to chapter 29.68 RCW; adding a new section to chapter 29.51 RCW; adding a new section to chapter 29.15 RCW; adding a new section to chapter 7.16 RCW; and creating a new section.

BE IT ENACTED BY THE PEOPLE OF THE STATE OF WASHINGTON:

*NEW SECTION.* Sec. 1. The people of the state of Washington find that:

(1) The people will best be served by citizen legislators who are subject to a reasonable degree of rotation in office;

(2) Entrenched incumbents have become indifferent to the conditions and concerns of the people;

(3) Entrenched incumbents have an inordinate advantage in elections because of their control of campaign finance laws and gerrymandering of electoral districts;

(4) Entrenched incumbency has discouraged qualified citizens from seeking public office;

(5) Entrenched incumbents have become preoccupied with their own reelection and devote more effort to campaigning than to making legislative decisions for the benefit of the people;

(6) Entrenched incumbents have become closely aligned with special interest groups who provide contributions and support for their reelection campaigns, give entrenched incumbents special favors, and lobby office holders for special interest legislation to the detriment of the people of this state, and may create corruption or the appearance of corruption of the legislative system;

(7) The people of Washington have a compelling interest in preventing the self-perpetuating monopoly of elective office by a dynastic ruling class.

The people of the state of Washington therefore adopt this act to limit ballot access of candidates for state and federal elections.

*NEW SECTION.* Sec. 2. A new section is added to chapter 43.01 RCW to read as follows:

(1) No person is eligible to appear on the ballot or file a declaration of candidacy for governor who, by the end of the then current term of office will have served, or but for resignation would have served, as governor during eight of the previous fourteen years.

(2) No person is eligible to appear on the ballot or file a declaration of candidacy for lieutenant governor who, by the end of the then current term of office will have served, or but for resignation would have served, as lieutenant governor during eight of the previous fourteen years.

*NEW SECTION.* Sec. 3. A new section is added to chapter 44.04 RCW to read as follows:

(1) No person is eligible to appear on the ballot or file a declaration of candidacy for the house of representatives of the legislature who, by the end of the then current term of office will have served, or but for resignation would have served, as a member of the house of representatives of the legislature during six of the previous twelve years.

(2) No person is eligible to appear on the ballot or file a declaration of candidacy for the senate of the legislature who, by the end

of the then current term of office will have served, or but for resignation would have served, as a member of the senate of the legislature during eight of the previous fourteen years.

(3) No person is eligible to appear on the ballot or file a declaration of candidacy for the legislature who has served as a member of the legislature for fourteen of the previous twenty years.

*NEW SECTION.* Sec. 4. A new section is added to chapter 29.68 RCW to read as follows:

No person is eligible to appear on the ballot or file a declaration of candidacy for the United States house of representatives who, by the end of the then current term of office will have served, or but for resignation would have served, as a member of the United States house of representatives during six of the previous twelve years.

*NEW SECTION.* Sec. 5. A new section is added to chapter 29.68 RCW to read as follows:

No person is eligible to appear on the ballot or file a declaration of candidacy for the United States senate who, by the end of the then current term of office will have served, or but for resignation would have served, as a member of the United States senate during twelve of the previous eighteen years.

*NEW SECTION.* Sec. 6. A new section is added to chapter 29.51 RCW to read as follows:

Nothing in sections 2 through 5 of this act prohibits a qualified voter of this state from casting a ballot for any person by writing the name of that person on the ballot in accordance with RCW 29.51.170 or from having such a ballot counted or tabulated, nor does anything in sections 2 through 5 of this act prohibit a person from standing or campaigning for an elective office by means of a write-in campaign.

*NEW SECTION.* Sec. 7. A new section is added to chapter 29.15 RCW to read as follows:

(1) The secretary of state or other election official authorized by law shall not accept or verify the signatures, nor accept a declaration of candidacy or a nomination paper, from or on behalf of a person who, by reason of sections 2 through 5 of this act, is ineligible for the office, nor allow the person's name to appear on the ballot.

(2) No terms or years served in office before November 3, 1992, may be used to determine eligibility to appear on the ballot.

*NEW SECTION.* Sec. 8. A new section is added to chapter 29.68 RCW to read as follows:

Sections 4 and 5 of this act, regarding candidates for federal legislative office, are not effective until nine states other than Washington have passed laws limiting ballot access or terms of federal legislative office, or both, based on length of service in federal legislative office.

*NEW SECTION.* Sec. 9. A new section is added to chapter 7.16 RCW to read as follows:

Any resident of this state may bring suit to enforce sections 2 through 8 of this act. If the person prevails, the court shall award the person reasonable attorney's fees and costs of suit.

*NEW SECTION.* Sec. 10. If any provision of this act or its application to any person or circumstance is held invalid, the remainder of the act or the application of the provision to other persons or circumstances is not affected.

## APPENDIX B

### *COMPENDIUM OF RELATED LAW REVIEW ARTICLES*

The constitutionality of term limits measures is discussed in the following law review articles, notes, and comments:

Brendan Barnicle, Comment, *Congressional Term Limits: Unconstitutional by Initiative,* 67 Wash.L.Rev. 415 (1992);

Erwin Chemerinsky, *Protecting the Democratic Process: Voter Standing to Challenge Abuses of Incumbency,* 49 Ohio St.L.J. 773 (1988);

Comment, *Term Limits and the Seventeenth and Nineteenth Amendments: A Reconceptualization of Article V,* 103 Yale L.J. ____ (April, 1994) (forthcoming);

Erik H. Corwin, Recent Development, *Limits on Legislative Terms: Legal and Policy Implications,* 28 Har.J. On Legis. 569 (1991);

Robert C. DeCarli, Note, *The Constitutionality of State–Enacted Term Limits Under the Qualifications Clauses,* 71 Tex. L.Rev. 865 (1993);

Troy Eid and Jim Kolbe, *The New Anti–Federalism: The Constitutionality of State–Imposed Limits on Congressional Terms of Office,* 69 Denv.U.L.Rev. 1 (1992);

Neil Gorsuch and Michael Guzman, *Will the Gentlemen Please Yield? A Defense of the Constitutionality of State–Imposed Term Limitations,* 20 Hofstra L.Rev. 341 (1991);

Steven R. Greenberger, *Democracy and Congressional Tenure,* 41 DePaul L.Rev. 37 (1991);

Roderick M. Hills, Jr., *A Defense of State Constitutional Limits on Federal Congressional Terms,* 53 U.Pitt.L.Rev. 97 (1991);

Tiffanie Kovacevich, Comment, *Constitutionality of Term Limitations: Can States Limit the Terms of Members of Congress?,* 23 Pac.L.J. 1677 (1992);

Martin E. Latz, *The Constitutionality of State–Passed Congressional Term Limits,* 25 Akron L.Rev. 155 (1991);

Joshua Levy, Note, *Can They Throw the Bums Out? The Constitutionality of State–Imposed Congressional Term Limits,* 80 Geo.L.J. 1913 (1992);

Johnathan Mansfield, Note, *A Choice Approach to the Constitutionality of Term Limitation Laws,* 78 Cornell L.Rev. 966 (1993);

Stephen J. Safranek, *Term Limitations: Do the Winds of Change Blow Unconstitutional?,* 26 Creighton L.Rev. 321 (1993).